The State ex inf. Crow, Attorney-General, v. Lindell Railway Company.

In Banc, June 30, 1899.

1. Corporation: AUTHORITY TO GRANT CHARTERS. Prior to the adoption of the Constitution of 1865, the General Assembly alone had power to grant charters to corporations. Thereafter corporations could not be created by special acts of the legislature, except for municipal purposes, but could be formed under general laws.

State ex inf. v. Lindell R'y Co.

2. ——: EXISTING UNDER SPECIAL CHARTERS: ACCEPTANCE OF GEN-
ERAL LAW. By the Constitution of 1875 manufacturing and busi-
ness corporations then existing under special acts might come in
under the general laws, and might extend their business to any other
purpose authorized by them.

3. ——: ——: ——: STREET RAILWAY: EXTENDING TERMINI.
A corporation, which was first organized under a special act to
construct and operate a street railway between designated termini,
and which accepted and came in under the general laws, has author-
ity to extend its termini, and to carry the public a greater distance
for the same price it was formerly authorized to charge. And
where the statute gives the company power to convey and transport
passengers, and does not require it to specify the beginning and
ending of the route, but it unwillingly or unwisely does so, it still
has power to extend its termini, especially if it is thereby benefiting
the public.

4. ——: ——: ——: ——: ACQUIRING OTHER ROADS. Such
company also has authority to acquire another street railroad and
make the two one continuous route and charge the traveler one
fare where he had formerly been obliged to pay two.

5. ——: STREET RAILWAYS: HIGHWAYS: POWERS OF CITY OVER THEM.
The power which the State primarily had over all streets and
highways in the State or in any city of the State, has in St. Louis,
been transferred to that city, and the General Assembly has no
power to authorize the construction, operation or transfer of any
street railway in St. Louis (or in any other city, town or village)
without the consent of the city.

6. ——: ——: POWER IN CITY TO MAKE GRANT. The city of St.
Louis has power by ordinance to grant to a street railroad com-
pany organized under a special act of the legislature in 1864, au-
thority to extend its termini over streets from which it was by said
act excluded; and also to acquire and operate other railways as
one continuous part of its system.

7. ——: ——: ——: "THIRD PARALLEL LAW:" UNCONSTITU-
TIONAL. The act of January 16, 1860, known as the "Third Paral-
lel Law" (Acts 1859-'60, p. 516), prohibiting street car lines in St.
Louis from thereafter being constructed by any company except
the companies therein named, on any street nearer than three
blocks to any line already constructed, etc., is no longer an exist-
ing statutory law, being in conflict with the act of 1866 and the
Constitution of 1875. And ordinances of the city of St. Louis
passed in disregard of it are not void for being inconsistent with
it. (Overruling St. Louis Railroad Co. v. South St. Louis Rail-
road Co., 72 Mo. 67.)

## *Quo Warranto.*

WRIT OF OUSTER DENIED.

EDWARD C. CROW, Attorney- General, T. K. SKINKER and SIM T. PRICE for relator.

. (1)    Corporations are creatures of the law, and when they fail to perform duties which they were incorporated to perform, and in which the public have an interest, or do acts which are not authorized or are forbidden them to do, the State may forfeit their franchises and dissolve them by an information in the nature of a *quo warranto*.    2 Beach, Priv. Corp., sec. 840; State ex rel. v. Meek, 129 Mo. 431; People v. N. R. Sugar Ref. Co., 121 N. Y. 582; People v. Chicago L. S. Exc., 170 Ill. 556; People v. Chicago Gas Trust, 130 Ill. 268; People v. Pullman Palace Car Co., 51 N. E. Rep. 670; Railroad v. Canal Comm., 29 Pa. St. 9; State ex inf. v. Lincoln Trust Co., 144 Mo. 387.    (2)    Section 3 of ·Act of 1860 is an existing and valid law, and an application of its provisions, to the admitted facts in this case, bars respondent from exercising the right to construct and operate its railroad on and over the Channing-Cook-Prairie and Evans avenue route. Acts 1859-60, p. 516; St. Louis R. R. Co. v. Railroad, 69 Mo. 65; St. Louis R. R. Co. v. Railroad, 72 Mo. 67; St. Louis v. Railroad, 89 Mo. 48; Manker v. Faulhaber, 94 Mo. 430. (3)    Under the laws of Missouri, the charter of the company and the amendments thereof, the Lindell Railway Company has no power or right to construct its railroad on or over Channing, Cook, Prairie or Evans avenues; nor has said company the power or authority to purchase or lease and operate the lines of street railroad of any or all of the several companies ·named in the information.    Acts 1864, p. 486; Secs. 2508, 2509, 2567, 2568, 2568a, 2569, 2768, 2771, 2779, 2786 and 2788, R. S. 1889; Sec. 7, art. XII, Const. 1875; State ex rel. v. Corkins, 123 Mo. 68.    The attempted grant of power by

the city by ordinance 19429 was void because the company could not accept the same.    Benevolent Society v. Murray, 145 Mo. 628; Douthitt v. Stinson, 63 Mo. 268; Reinhard v. Mining Co., 107 Mo. 616.    (4)    Power to buy or sell, or to make or accept a lease of a railroad property is not among the ordinary powers, and is not to be presumed from the usual grant of powers in a charter.    Thomas v. Railroad, 101 U. S. 71; St. Louis A. & C. R. R. v. Railroad, 118 U. S. 290; Railroad v. Texas, 75 Tex. 434; Middlesex R. R. v. Railroad, 115 Mass. 347; Dow v. Railroad, 36 Atl. Rep. 510; Railroad v. Morris, 67 Tex. 692.

W. M. WILLIAMS and H. S. PRIEST for respondent.

(1)    *Quo warranto* will not lie to determine a mere private right.    It will only be entertained at the instance of the State, when some franchise residing in or granted by the State has been usurped or abused to the injury of the public. Atty.-General v. Railroad, 55 N. A. 562; People v. Railroad, 1 Am. R. R. & Corp. Rep. 588; Spelling's Extra. Relief, secs. 1829 and 1830; State ex rel. v. Minn. Mfg. Co., 40 Minn. 213; State v. Railroad, 60 N. W. Rep. 121.    (2)    *Quo warranto* can only lie for an accomplished act—an actual usurpation or abuse of a franchise.    Com. v. Railroad, 58 Pa. St. 36; State v. Lyons, 31 Ia. 432; State v. Kingman, 51 Ind. 143; State v. Beck, 81 Ind. 500; State v. Thompson, 16 Wend. 655; State v. Martin, 33 Pac. Rep. 9; State v. Meek, 129 Mo. 431; 2 Spelling, Extra. Rem., sec. 1774.    (3)    The act of January 16th, 1860, the third section of which is commonly called the Third Parallel Law, is not now in force.    This act, notwithstanding it contains reference to others matters, was an amendment to the then city charter of St. Louis.    1 Dill. Munic. Corp. (4 Ed.), sec. 55.    It was repealed by:    (a)    The Act of the General Assembly of February 15, 1864 (Laws 1863 and 4, p. 446); (b)    The Act of March 19th, 1866 (Acts 1866, p. 279; Art. IV, clause 51); (c)    Article X of the

Charter of the city of St. Louis; Railroad v. Railroad, 50 S. W. Rep. 302; (d) The Act of Feb. 23d, 1881 (Acts 1881, p. 84); (e) The Acts of March 31st, 1885 (Acts 1885, p. 94); (f) Sec. 1186, R. S. 1889; (g) Section 1, Schedule Const. 1875; Deal v. Miss. Co., 107 Mo. 464. (4) The respondent was authorized to lease the Compton Heights, etc., and the Taylor avenue roads, and to purchase the Vandeventer avenue road. First. By virtue of its special charter of January 26th, 1864, set forth in the information. This charter gave it the "power to construct a double track railway,   .  .  .  . in the city and county of St. Louis," for "the carrying of passengers by horse power," and "to make contracts of every kind and nature, and buy, hold, and sell real and personal property." Second. By virtue of its acceptance of the general laws of this State, and extending its powers to the construction and operation of any line or lines of street railway which the municipal authorities of the city of St. Louis have theretofore or might thereafter authorize it to acquire, construct, own or operate. Hovelman v. Railroad, 79 Mo. 643; State ex rel. v. Railroad, 140 Mo. 550. Third. By virtue of the implied power of a corporation to do whatever it is not prohibited from doing, that will conduce to the successful accomplishment of its corporate enterprise. Miners Ditch v. Zellerbach, 37 Cal. 543; Railroad v. Railroad, 135 Mo. 199; Burford v. Packet Co., 3 Mo. App. 159; State v. Hannibal, etc., Co., 37 Mo. App. 496; Railroad v. Railroad, 48 N. J. Law, 560; Branch v. Jessup, 106 U. S. 468; Morawetz, Pri. Corp. (2 Ed.), sec. 372. Fourth. By virtue of the charter and ordinance of the city of St. Louis. Railroad v. Railroad, 50 S. W. Rep. 302. Fifth. By virtue of the provisions of the general railroad law of the State. R. S. 1889, secs. 2567, 2568 and 2568a; In re Railroad, 22 N. E. 356; Chicago v. Evans, 24 Ill. 52; Railroad v. Phila., 89 Pa. St. 210; 1 Elliott's R. R. Law, sec. 6; 3 Cook on Corps., sec. 915; Rafferty v. Traction Co., 23 Atl. Rep. 884. (5) Neither

section 17, art. XII of the Constitution, nor sec. 2569, R. S. 1889, have application to street railway companies. Appeal of Montgomery, 20 Atl. Rep. 399; Rafferty v. Traction Co., 23 Atl. Rep. 884.

MARSHALL, J.—This is an original proceeding of *quo warranto,* instituted by the Attorney-General, *ex officio,* to oust the respondent from exercising the following rights, privileges and franchises:

First. Of extending, constructing, maintaining, and operating a street railroad with a double track in the city of St. Louis on and along a route described as follows, to wit: Beginning at the intersection of the tracks of the Forest Park, Laclede and Fourth Street Railway Company at Laclede avenue, where the same intersects Channing avenue, thence northwardly along Channing avenue to and into Cook avenue, thence westwardly along Cook avenue to and into Prairie avenue, thence northwardly along Prairie avenue to and into Evans avenue, thence westwardly along Evans avenue to and into Taylor avenue to a connection with the tracks of the Taylor Avenue Railway Company.

Second. Of having acquired by purchase, lease, or otherwise, from certain corporations known as the Compton Heights, Union Depot & Merchants' Terminal Railway Company, the Taylor Avenue Railroad Company, and the Vandeventer Avenue Railroad Company, and of maintaining and operating, in conjunction with the lines of the Lindell Railway Company hereinbefore described, as one entire system, all and singular the several lines of railroad and property now owned or formerly owned and operated by said Compton Heights, Union Depot & Merchants' Terminal Railway Company, the Taylor Avenue Railroad Company, and the Vandeventer Avenue Railroad Company, together with all rights, privileges, and franchises which have heretofore been granted to said corporations or either of them by the city of St. Louis and which are now in force.

Third.  Of acquiring by lease, purchase, or otherwise, from certain corporations known as the Missouri Railroad Company, the Forest Park, Laclede & Fourth Street Railway Company, and the Delmar Avenue & Clayton Railway Company, and of maintaining and operating in conjunction with the lines of the Lindell Railway Company, and of the Compton Heights, Union Depot & Merchants' Terminal Railway Company, the Taylor Avenue Railroad Company, and the Vandeventer Avenue Railroad Company, as one entire system, all and singular the several lines of railroad and properties now owned and operated by said Missouri Railroad Company, Forest Park, Laclede and Fourth Street Railroad Company, and the Delmar Avenue and Clayton Railway Company, together with all rights, privileges and franchises which have heretofore been granted to said corporations or either of them by the city of St. Louis, and which are now in force.

The return of the respondent is very voluminous, covering thirty-six printed pages.  In brief it asserts a right to have and enjoy the franchises challenged, by virtue of the following provisions of the laws of this State:

1st.  Its special charter, granted to it by the State on the 26th of January, 1864 (Acts 1863-4, p. 486), under which it was authorized to construct, maintain and operate a street railway in the city and county of St. Louis along stated streets and between fixed terminii, the routes here called in question not being embraced therein.

2d.  By its acceptance of the general laws of this State, and its extension, according to those laws, of its original powers so as to authorize it to acquire, construct and operate any line or lines of street railway which the municipal authorities of St. Louis have theretofore or might thereafter authorize it to acquire, construct, own or operate.

3d.  By the amendment of its charter on the 28th of February, 1899, so as to authorize it to extend its business to

the ownership, construction or operation of any line of street railway in the city or county of St. Louis that it might then or thereafter be authorized to acquire, construct or operate by virtue of any ordinances of the city of St. Louis or order of the county court of St. Louis county.

4th. By the implied power of a corporation to do whatever it is not prohibited from doing that will conduce to the successful accomplishment of its corporate enterprise.

5th. By the authority of the charter and ordinances of the city of St. Louis.

6th. By the provisions of the general railroad law of the State.

The several laws, statutes, charter provisions and ordinances upon which these claims of authority are based are referred to and specially pleaded, and will be discussed in the course of this opinion.

The return also claims the act of January 16th, 1860, entitled "an Act concerning Street Railroads in the city of St. Louis" and referred to herein as the "Third Parallel Law." [Acts 1859-60, p. 516] is no longer in force and has been repealed.

The relator moves for judgment on the return.

Two questions present themselves in this case for determination: 1st. Has the respondent the power to accept the grants and to exercise the franchises challenged; and 2d. Has the city the power to make the grants?

I.

Has the respondent the power to accept the grants and to exercise the franchises challenged?

Prior to the adoption of the Constitution of 1865, the General Assembly of the State alone had power to grant charters to corporations. Under its power the General Assembly on January 26th, 1864, granted the original charter to the respondent [Acts 1863-4, p. 486], by which it

acquired the power to construct a double track railway in the city and county of St. Louis, along designated routes and between fixed terminii, which did not cover the routes challenged in this proceeding, and the respondent accordingly constructed the authorized railway. At the same session, to wit, on the 15th of February, 1864, the General Assembly passed an Act entitled, "An Act for the benefit of the city of St. Louis," the first section of which provided: "That the city council of the city of St. Louis shall have full power, with the approval of the mayor, to determine all questions arising with reference to street railroads in the corporate limits of said city, whether such questions may involve the incorporation of companies to construct such street railroads, granting the right of way or regulating and controlling any such railroads after their completion." [Acts 1863-4, p. 446.]

Thereafter the Constitution of 1865 was adopted, and in order to stop the granting of ill-advised, incongruous and dissimilar charters by the General Assembly, and to insure uniformity between charters of companies doing similar business, section 4, of article VIII was adopted, by which it was provided: "Corporations may be formed under general laws, but shall not be created by special acts, except for municipal purposes. All general laws, and special acts passed pursuant to this section may be altered, amended or repealed."

Accordingly the General Assembly by an Act entitled "An Act concerning private corporations," approved March 19th, 1866 [Acts 1865-6, p. 20], enacted general laws defining the general powers and liabilities of all private corporations, and provided for the organization of seven different kinds of corporations, to wit. 1. Railroad companies. 2. Macadamized, graded and plank road companies. 3. Telegraph companies. 4. Insurance companies. 5. Savings banks and fund companies. 6. Manufacturing and business companies. 7. Benevolent, religious and educational

associations, and this Act passed into the General Statutes of Missouri 1865, under Title XXIV, and was divided into chapters 62, 63, 64, 65, 67, 68, 69 and 70. It will be observed that there was no express provision made for the incorporation of street railways, but the 6th object for which manufacturing and business companies were authorized by section 1 of chapter 69, was "to convey and transport persons and freights on land or water, by any mode of conveyance whatever." Inasmuch as there seemed to be some question in the minds of the legislators as to their power under that Constitution to amend special charters theretofore granted, and in order to effectuate the scheme and policy of the organic law to have all similar corporations governed by the same law, section 10 of chapter 69, relating to manufacturing and business companies, made express provision for any company then existing or which might thereafter be formed under that general law to increase or diminish its capital stock, and further provided: "And any existing company heretofore formed under the general law or any special act, may come under and avail itself of the privileges and provisions of this chapter, by complying with the following provisions, and thereupon, such company, its officers and stockholders shall be subject to all the restrictions, duties and liabilities of this chapter." Specific methods followed for the accomplishment of the intended changes.

This constitutional policy (Sec. 4, Art. VIII, Const. 1865) worked so well that when the Constitution of 1875 was adopted, the policy was continued and extended and further limited. Section 2 of Art. XII, Constitution 1875, provides: "No corporation, after the adoption of this Constitution, shall be created by special laws; nor shall any existing charter be extended, changed or amended by special laws, except those for charitable, penal or reformatory purposes, which are under the patronage and control of the State." The policy of having private corporations regulated by general laws had worked

so well that the Constitution of 1875 left out the exception of corporations for municipal purposes, which the Constitution of 1865 had preserved, and by section 7 of article IX (Const. 1875) extended the policy to municipal corporations and provided: "The General Assembly shall provide, by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions. The General Assembly shall also make provisions, by general law, whereby any city, town or village, existing by virtue of any special or local law, may elect to become subject to, and be governed by, the general laws relating to such corporations." Provision was also made by section 16 for cities of over 100,000 to frame their own charters, and by sections 20 to 25 for the city of St. Louis to frame its own charter.

Thereafter the provisions of section 10 of chapter 69, G. S. 1865, relating to manufacturing and business companies existing under special charters coming in under the general laws, were carried into the revision of 1879, and became a part of section 937, of Art. VIII of Chap. 21, of that revision, and in addition to the power to increase or diminish its stocks power was given to "extend its business to any other purpose authorized by this article."

Thus the law stood until 1885, when Sec. 707 of Art. I, Ch. 21, R. S. 1879, which until then had confined the general provisions relating to the powers, duties and liabilities of corporations that were created after the adoption of the general corporation laws, was amended and made to read as follows:

"Section 707. The powers enumerated in the preceding section, shall vest in every corporation that shall hereafter be created or organized, and any corporation, including those heretofore organized, and now in existence under any general

or special law of this State, may accept the provisions of the general laws of this State, relating to corporations, by filing with the Secretary of State a certificate of such acceptance, signed by its president and secretary, duly authorized by its board of directors and approved by a vote of three-fourths of its stockholders at any meeting duly and legally called for that purpose, notice of such meeting first having been given in manner and form as provided in sections 727 and 728 of this article, or by three-fourths of the stockholders, in writing, and upon the filing of such certificate, the time of the existence of said corporation shall be extended for such period as was originally permissible to it, or as may be stated in its certificate of acceptance. But nothing herein contained shall extend or continue to any corporation organized or existing under a special law or charter any special privilege, immunity, franchises or exemptions not possessed by corporations organized under the general laws of this State, and any corporation organized or existing under special law or charter, shall, by accepting or availing itself of the provisions of this act, be deemed and held to thereby waive and surrender any and all such special privileges, immunities, franchises and exemptions and it shall be subject to all the duties and obligations of corporations under the general laws of this State; provided further, that the duration of such corporation shall not be continued as aforesaid, until such corporation shall pay into the state treasury fifty dollars for the first fifty thousand or less of the capital stock of the corporation, and a further sum of five dollars for every additional ten thousand dollars of its capital stock, as provided by law; provided that nothing in this act contained shall be construed to authorize the renewal, continuance or extension of the charter of any company engaged in the manufacture or sale of illuminating gas." (Acts 1885, p. 81.)

This amendment was carried into the revision of 1889, as section 2509, of Art. I of Chap. 42. And the provisions of

section 937, R. S. 1879, which with the addition noted, had been brought forward from Sec. 10 of Chap. 69, G. S. 1865, were re-enacted in the revision of 1889 and became section 2779, R. S. 1889, and the right "to extend its business to any other purposes authorized by this article" was preserved in this revision.

The return shows (and the motion for judgment, therefore, admits the truth of the allegation), "that pursuant to the provisions of the Constitution of this State, and the statutes enacted by authority thereof, it did, on the 24th day of May, 1887, accept all the provisions of article VIII, chapter 42, of the Revised Statutes of 1889, relating to manufacturing and business companies, and pursuant to the power contained in said chapter and the general laws of this State, it did so amend its charter as to extend its power so as to authorize it to construct and operate any line or lines of street railway which the municipal authorities of the city of St. Louis had therefore, or might thereafter authorize it to acquire, construct, own or operate.    And that the said amendment to its charter so made pursuant to the authority of the said statutes and of its stockholders, was duly filed with the Secretary of State on the —— day of July, 1887."

The return also shows, "that having in due compliance with the statutes of this State accepted the general provisions of said statutes and particularly those contained in article VIII chapter 42 of the Revised Statutes of 1889, and having duly filed its acceptance thereof in the office of the Secretary of State, it did by the authority of a convention of its shareholders duly called on the 28th of February, 1899, so extend its charter powers as to authorize it, in addition to the powers then possessed, to extend its business to the ownership, construction or operation of such line or lines of street railways in the city and county of St. Louis, in addition to those now owned or operated by it, as it may now or hereafter be author-

ized to acquire, construct, or operate under and by virtue of ordinances of said city, or order of the county court of said county. Which said amendment of its charter was duly certified and filed in the office of the Secretary of State on the 6th day of March, 1899, having first filed the same in the recorder's office of the city of St. Louis."

It thus appears that the powers of the respondent granted to it by the Act of January 26th, 1864, have been materially enlarged since then by the amendments to its charter in 1887, and 1899; that instead of only having the right to construct and operate a railway over certain named streets and between fixed terminii, it now has the right to own, construct and operate any line or lines of street railway in the city and county of St. Louis which it may be authorized to acquire, construct or operate by virtue of ordinances of the city of St. Louis or orders of the county court of St. Louis county, and that instead of being a specially chartered company with limited rights, it is now a corporation organized under the general corporation laws of the State.

In compliance with the general laws of the State, it has lawfully amended its charter in the only manner now possible under those laws. It has extended its business from carrying passengers by horse power, between fixed terminii as its original charter authorized, to conveying persons by any mode of conveyance whatever over any line or lines of street railway in St. Louis that it may be authorized by ordinances of that city to own, acquire, construct or operate, and over such as the county court of St. Louis county may authorize.

It had therefore full power to accept the grant embraced in ordinance No. 19429, approved October 28th, 1898, to construct and operate a line of street railway on Channing, Cook, Prairie and Evans Avenues.

By virtue of section 6 of ordinance No. 19429, approved October 28th, 1898, it had express power to acquire or lease the Compton Heights, Union Depot and Merchants' Terminal

Railroad Company, the Taylor Avenue Railway Company, the Vandeventer Avenue Railway Company, the Missouri Railroad Company, the Forest Park, Laclede and Fourth Street Railway Company and the Delmar Avenue and Clayton Railway Company, and the said companies "were severally authorized and empowered to sell and transfer or lease to this respondent, at such price and upon such terms as they may mutually agree, all and singular the several lines of railroad and properties now owned or operated by said companies respectively, together with all rights, privileges and franchises which have been granted to said companies, or either of them, by the city of St. Louis.    That said grant was made upon the condition, among others, that the rate of fare for a single continuous passage one way over its entire line of railway, and acquired and operated by the Lindell Railway Company, should not exceed five cents for adults and two and one-half cents for children under the age of twelve years and over three years. And upon the further condition that, should it not run through cars over all of the branches or parts of the system when completed by the acquisition of the said main roads, it should, where the same connect and intersect the present line of the Lindell Railway Company, issue transfer tickets to such passengers as having taken passage desire to continue the same from one part of said road to another."

The return shows (and the motion for judgment admits its truth) that the respondent has acquired the rights authorized by this ordinance.

Relator however denies the power of the respondent to so amend its charter as to authorize it to extend the original terminii fixed by the Act of 1864 or so as to authorize it to lease or acquire the rights granted to the other roads, and insists that the provision of section 2779, R. S. 1889, which authorizes a corporation to "extend its business to any other purposes authorized by this article," etc., only gives permission to a corporation organized for one of the eleven purposes allowed by

section 2771, to enlarge or extend its business so as to embrace another of those eleven purposes.

This is a very narrow construction to place upon this provision of section 2779. It admits the power to expand so as to take in something entirely incongruous to the original purpose, but denies the power to extend the limits of the one purpose that was originally declared, albeit such extension is harmonious with the original object of the corporation. Or otherwise stated, the relator's contention is that a company organized as a street railroad may be expanded so as to embrace the right to be a mining or manufacturing company, or an agricultural or stock company, or a fair association, or a toll bridge company, or a hotel company, or a water or gas company, but if its terminii were fixed by the original incorporation or its right was therein limited to the construction and operation of a street railroad, it could not amend its charter so as to extend the original terminii or to include the right to buy or lease a road already constructed.

In other words, this contention concedes the right to amend the charter so as to include everything that is foreign to the original purpose of the corporation, but denies the right to amend its charter along the lines of the original purpose and in order the better to carry out that purpose and the better to serve the public by carrying the public twice the original distance for the same fare or price.

Such a construction is best illustrated by the maxim *"Qui haeret in litera, haeret in cortice."*

We do not so construe that section. It was intended primarily for the other purpose—to make it possible to enlarge the original purpose along the same lines so as to keep step with the development of the business of the corporation and with the public demands for its service. There is, and can be, no public policy which would prohibit a street railway from extending its terminii and thereby carrying the public a greater

distance for the same price it was formerly authorized to charge for carrying them a shorter distance. Neither does public policy prohibit one street railroad from acquiring another street railroad and making the two one continuous route and charging the traveler one fare where he had formerly been obliged to pay two fares to travel the same distance. This is clearly shown by the statutes of this State which permit steam railroads (Sec. 2567), macadamized and plank road companies (Sec. 2691) and telegraph and telephone companies (Sec. 2732) to do so.

It is argued however that in all these cases express authority is conferred by statute and that no such power is given to a street railroad company by statute and hence it does not exist. The proposition, and the reasoning, is undoubtedly true, but the application to this case is fallacious, for the statute gives a street railroad company the right to convey and transport passengers and does not require it to specify the beginning and ending of its route, and if it has tied its own hands unwillingly or unwisely in the first place, the statute gives it the right to untie the bond and leave itself free of restriction, especially if, as above shown, it is thereby benefiting the public.

Relator cites cases holding that in the absence of legislative permission, a steam railroad which is authorized to construct and operate a road between termini, can not buy, own, lease or operate any other road, but an analysis of those cases shows that the laws under which they arose, were similar to the fifth clause of section 2543, R. S. 1889, which restricts a steam railroad to the right to cross, intersect, join and unite its railroad with any other railroad previously constructed, etc., simply for the purpose of exchanging freights or else that the fare the steam railroad was authorized to charge was measured by a certain price for each mile traveled and not, as in the case of a street railroad, a certain sum for a continuous passage from one end of its route to another, if the passenger chose to

ride that far, or else they were bottomed upon the idea that such combination of steam railroads tended to create a monopoly, for steam railroads are not authorized to condemn a right to run longitudinally over each other's tracks, while as to street railroads no monopoly is possible, because a new road can acquire a right to run over the tracks of an existing road and thereby become a competitor to it. [Sec. 6, Art. X, Charter of St. Louis; Union Depot Railroad Co. v. Southern Ry. Co., 105 Mo. 562.]

Moreover the City of St. Louis expressly granted the right in this case to the respondent, and we shall hereinafter show the city had the power to do so, and therefore the cases cited find all the requirements they prescribe fully met and complied with in this case. We conclude therefore that the respondent had the power to accept the grant and to exercise the franchises challenged.

## II.

Has the city the power to make the grants?

A. It is stated in the return and conceded by counsel that from time to time the city granted the respondent the right to extend its lines beyond the terminii stated in its original charter, and that the respondent accepted the grants and has constructed and operated the extensions. These grants are greater in extent and longer in mileage than those challenged in this case, yet no one has ever questioned their legality and relator expressly disclaims any desire to have respondent ousted therefrom in this proceeding.

No reason is given for this discrimination, nor are we advised that there is any difference in principle between those grants and these involved here. If relator's contentions are correct the respondent had no more power to accept those grants than it has to accept these, and the same is true of the power of the city to make the grants. We can see no reason

therefore, for making "fish of one and flesh of the other." It raises, however, the suspicion that it is simply "a question of whose ox is gored." For this reason alone we would deny the writ asked in this case, if there was no better reason present.

B. We will not rest the case here, however, for the principles involved are of general importance and it is better to settle them now.

The point is this: It is claimed that the Act of January 16th, 1860, commonly called the "Third Parallel Law," is a valid, unrepealed law duly enacted when the body that alone had power to speak on the subject, and that as the grants here challenged are violative of that law they are *ultra vires* of the power of the city and are therefore void.

We have above called attention to the Act of February 15th, 1864 (Acts 1863-4, p. 446), by which the mayor and council of St. Louis were given power, "to determine all questions arising with reference to street railroads in the corporate limits of said city, whether such questions may involve the incorporation of companies to construct such street railroads, granting the right of way or regulating and controlling any such railroads after their completion."

Thereafter by an Act entitled "An Act to revise the charter of the City of St. Louis," approved March 19th, 1866 (Acts 1865-6, p. 279-287), it was provided by section 1 of article IV thereof, that, "The mayor and city council have power within the city by ordinance, not inconsistent with any law of this State: . . . Fifty-first, To have the sole power and authority to grant the right of any person or persons, corporation or company to make and construct street railways in any street of said city, and to regulate and control the same and the use thereof."

Thus the matter stood until the Constitution of 1875 was adopted, in which by sections 20 to 25 of article IX, the city and county of St. Louis were authorized to separate by a vote of the people, and to adopt a scheme for the organic law of the

county and a charter for the organic law of the city, which it was provided should, sixty days after they were adopted, "take the place of and supersede the charter of the city of St. Louis, and all amendments thereof, and all special laws relating to St. Louis county, inconsistent with such scheme." Under this constitutional authority a scheme for the organic law of the county and a charter for the organic law of the city was adopted. Among the charter provisions it was provided by section 26 of article III of the charter, so adopted: "The mayor and assembly shall have power within the city, by ordinance not inconsistent with the Constitution or any law of this State or of this charter. . . . Eleventh: To take all needful steps in and out of the State to protect the rights of the city in any corporation in which the city may have acquired an interest; to have sole power and authority to grant to persons or corporations the right to construct railways in the city, subject to the right to amend, alter or repeal any such grant, in whole or in part, and to regulate and control the same, as to their fares, hours and frequency of trips, and the repair of their tracks, and the kind of their rails and vehicles," etc.

And the whole of article X of the charter was devoted to street railroads and the power of the city over them. Section one provided as follows: "The municipal assembly shall have power, by ordinance, to determine all questions arising with reference to street railroads, in the corporate limits of the city, whether such questions may involve the construction of such street railroads, granting the right of way, or regulating and controlling them after their completion; and also shall have power to sell the franchise or right of way for such street railroads to the highest bidder, or as a consideration therefor, to impose a *per capita* tax on the passengers transported, or an annual tax on the gross receipts of such railroad, or on each car; and no street railroad shall hereafter be incorporated or built in the city of St. Louis, except according to the above

and other conditions in this charter; and in such manner and to such extent as may be provided by ordinance."

In this connection it is proper to call attention to section 20 of article XII of the Constitution of 1875, which is as follows: "No law shall be passed by the General Assembly granting the right to construct and operate a street railroad within any city, town, village, or on any public highway, without first acquiring the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad; and the franchises so granted shall not be transferred without similar assent."

At first it was confidently asserted that this charter, so adopted by the express power granted by the Constitution created St. Louis an *"imperium in imperio,"* free from all State control, but it was soon ascertained that this was not so, for section 25 of the same article (IX) of the Constitution provided: "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State," and that sec. 23 of that article of the Constitution also provided: "Such charter and amendments shall always be in harmony with and subject to the Constitution and laws of Missouri."

Looking at these constitutional provisions, together, it is plain that it was the purpose of the Constitution of 1875, to grant to St. Louis and other cities and localities the benefit of "home rule," so far as it was possible, but it was not intended to abdicate State sovereignty over them nor to raise them higher in authority than the State of which they form a part.

It was plainly the effectuating of the policy expressed in the act of February 15th, 1864, and of March 19th, 1866, revising the city charter of St. Louis, of giving to the city the sole power and authority to grant the right to construct or operate street railways in St. Louis, and also the sole power to regulate the transfer of such franchises from one person or

company to another.   This intention is clearly evidenced, not
only by the affirmative grant of sole power, but by the nega-
tiving of such power over grants or transfers of such rights to
the General Assembly.   And when to these provisions we add
the power given by its charter "to construct and keep in repair
all bridges, streets, sewers and drains, and to regulate the use
thereof" (Par. 2, Sec. 26, Art. III) it conclusively appears,
hedged about directly and prohibitively, that the power which
the State primarily had over all streets and highways in the
State or in any city of the State, has in St. Louis, been trans-
ferred to that city, and that the General Assembly has no
power to authorize the construction, operation or transfer of
any street railway in St. Louis (or in any other city, town or
village) without the consent of the city.

But it is contended that the Act of January 16th, 1860,
is still a valid statutory enactment notwithstanding all these
constitutional and statutory enactments which have been
adopted and passed since that time, and that this Court sus-
tained and upheld that law in the cases of St. Louis Railroad
Co. v. Northwestern St. Louis Railway Co., 69 Mo. 65, and
St. Louis Railroad Co. v. South St. Louis Railroad Co., 72
Mo. 71, and incidentally in Union Depot Railroad Co. v.
Southern Railway Co., 105 Mo. 562.

An examination of the first case cited (69 Mo. 65) shows
that the case was begun on the 21st of July, 1874, which was
before the adoption of the Constitution of 1875, and hence
could not and did not decide the effect the provisions of that
Constitution, and the charter of St. Louis adopted under it,
had upon the Act of 1860, and that case did not decide the
question, but assumed that the law was still in force.   This is
expressly stated in the decision in St. Louis Railroad Co. v.
South St. Louis Railroad Co., 72 Mo. 1. c. 67, 68.

In the case last cited, the question of whether the present
charter of St. Louis repealed the Act of 1860, was before this
court and was discussed and disposed of in these words by

Hough, J., who delivered the opinion of the court: "The charter now in force in the city of St. Louis, under which the ordinance authorizing the defendant to build its road was passed, was framed and adopted in pursuance of the provisions of section 20, article IX of the Constitution of 1875, and vests the legislative power of the city in two houses, styled the Municipal Assembly of St. Louis. This charter superseded the former charter of the city and all amendments thereof, and was by the Constitution required to be in harmony with the laws of the State. This charter, like those previously noticed, confers upon the municipal assembly the sole power and authority to grant to persons or corporations the right to construct street railways in the city, by ordinances not inconsistent with any law of the State. Indeed the entire grant of legislative power is subject to the condition. [Art. III, sec. 26.] Article X of this charter provides that: 'The Municipal Assembly shall have power by ordinance to determine all questions arising with reference to street railroads in the corporate limits of the city, whether such questions may involve the construction of such street railroads, granting the right of way, or regulating and controlling them after completion,' etc. The power here conferred is to be exercised, of course, by such ordinances as the Municipal Assembly is competent to pass: That is, ordinances not inconsistent with the laws of the State. Article X is but a detailed amplification of the power conferred by the 11th clause of section 26, article III, besides being somewhat legislative in its character. It follows from the foregoing views that the Municipal Assembly had no power to disregard the regulations prescribed in the Act of January 16th, 1860." The Act of 1860 is upon this statement and reasoning held to be an existing, unrepealed law.

Tested by the rules of logic this case is this: The question is, was the Act of 1860 repealed by the adoption of the charter. The charter was required to be in harmony with and subject to the Constitution and laws of Missouri. The Act of

1860 is a law of the State of Missouri.    Therefore the Act of 1860 was not repealed by the charter.    This is reasoning in a circle, but it does not meet or decide the question presented.

Turn the proposition around and the other side of it is: In 1860, when the legislature alone had the power to legislate as to the streets of St. Louis, an act was passed prohibiting a street railroad from being constructed parallel to an existing street railroad on a street within three blocks of the existing road.    In 1866 the General Assembly of Missouri amended the charter of St. Louis and gave it sole power and authority to grant the right to any person "to construct street railroads in any street of said city and to regulate and control the same and the use thereof."    In 1875 the Constitution gave the city the power to adopt a charter which should supersede all prior charters.    The charter so adopted gave the city the sole right to regulate the use of its streets, to grant the right to construct street railways and to regulate street car companies.    The Constitution of 1875 expressly prohibited the General Assembly from granting the right to construct or operate or transfer a street railway in any city, town or village of the State without its consent.    The question therefore is, can the act of 1860 limiting the power of the city, stand at the same time and be made consistent with the Act of 1866 which conferred the sole power and authority upon the city, or with the charter which gave the city the sole power to regulate the use of its streets and the power to grant the right to construct street railroads upon it, or with section 20 of Art. XII of the Constitution which prohibits the General Assembly from granting the right to construct, operate or transfer a street railway in a city without its consent.    Or stated otherwise, can a prior act limiting a right, continue to exist, when the Constitution and subsequent acts vest the sole power in the city and prohibit the General Assembly from legislating upon the subject without the consent of the city.

The pertinent question might here be asked, what sacredness is there surrounding the special act of 1860 which protects it from repeal by subsequent acts of the General Assembly which are so inconsistent with it that both can not stand together, or that shields it from annihilation by changes in the Constitution that transfers the power that authorized its enactment to another power, but preserves it against the wishes of the new and sole authority, or that keeps it alive after the policy it expresses has been distinctively reversed by subsequent organic and legislative regulations. The Constitution only requires the city charter to be consistent and harmonious with the Constitution and the general laws of the State, not with prior special acts, the policy being to wipe out all prior special laws that conflicted with the charter the city was authorized to adopt.

If the sole power is, and has been since 1866, vested in the city, it is not possible that there can be any such restriction or limitation on that sole power as the Act of 1860 imposes. It is plain upon the face of the Act of 1860 that it was gotten up and its passage secured by and in the interest of the then existing railway companies, and was intended primarily and exclusively to prevent competition and *pro tanto* to create monopolies. This is plain from even a casual reading of the Act. The first section ratifies and confirms the rights previously granted to the St. Louis Railroad Company, the People's Railway Company, and the Citizen's Railway Co. The second section excuses them from building their authorized roads on Clark avenue, Chestnut street, Pine street, Locust street or Washington avenue, and authorizes them to run their roads on other named streets, but shuts the door against competition by reserving Clark avenue, Chestnut, Pine and Locust streets and Washington avenue forever from street car use. The third section further seeks to keep out competition by prohibiting a new road from being built on any street nearer than three blocks to a street on which there is a road already constructed,

but considerately exempts the three roads above mentioned from this rule.   The fourth section authorizes a change from a single to a double track.   The fifth section authorizes an extension of the St. Louis Railroad Company's line.   The sixth section authorizes the St. Louis Railroad Company to construct a branch, the Missouri Railroad Company to construct a branch, and to extend their line about a mile, and the People's Railway Company to extend its road.   The seventh section confirms a previous grant to the Compton Hill Railroad Co.   The eighth section confirms a grant to the Gravois Railroad Company on certain conditions.   The ninth section exempts "said railroad companies" from injuries received by passengers when getting on or off of the front or forward end of their cars.   The tenth section requires the Citizen's Railway Co. to get the consent of a majority of the property owners on Franklin Avenue before constructing its road on that street.

If this does not evidence a primary desire to subserve a selfish interest, rather than primarily establishing a police regulation for the benefit of the owners of property on two of every three streets by keeping street cars off of them, and only "incidentally affording a qualified exemption from competition to roads coming within the scope of the act," as was said in the case of St. Louis Railroad Co. v. South St. Louis Railroad Co., 72 Mo. 1. c. 68, to be the proper reading of the Act, then words must be convicted once more of being invented to conceal and not to express ideas.

Every word, phrase, paragraph and section of the Act is intended to confirm, preserve or extend a right previously or then granted to some one of the street car companies mentioned in the Act, and to prevent competition.   The fact that street car lines are prohibited from thereafter being constructed by any company, except the companies therein named, on any street nearer than three blocks to any line already

constructed, it may be conceded, would incidentally benefit
the owners of property fronting on the reserved streets, but
the act does not bear the construction that any such public
policy or benefit actuated the promoters in getting the law
enacted.

But it is unnecessary to further elaborate the discussion.
It is demonstratively plain that the Act of 1860 is no longer
an existing statute law, because it can not stand with the Act
of 1866 or with the provisions of the Constitution of 1875,
and the ordinances of the city of St. Louis passed in disregard
of it are not void as being inconsistent with it, for being itself
inconsistent with subsequent acts and with the Constitution, it
has ceased to exist, and hence those ordinances can not conflict
with what no longer exists. The case of St. Louis Railroad
Co. v. South St. Louis Railroad Co., 72 Mo. 67, was errone-
ously decided and is therefore overruled.

It follows that the city had the power to pass ordinance
19429, authorizing the construction of the street railroad on
Channing avenue, Cook avenue, Prairie avenue and Evans
avenue and also authorizing the respondent to acquire the
lines of the Compton Heights, Union Depot & Merchants Ter-
minal Railway; the Taylor Avenue Railroad Company and
the Vandeventer Avenue Railroad Company; the Missouri
Railway Co., the Forest Park, Laclede & Fourth street Rail-
way Company and the Delmar Avenue and Clayton Railway
Company. As was aptly said by GANTT, C. J., in Grand Avenue
Railway Co. v. Citizen's Railway Co., 148 Mo. l. c. 676:
"It is conceded by counsel, as we think it must be, that a
charter adopted by direct grant of the Constitution itself, has
all the efficiency of a legislative enactment, and that if such a
power be given to a city by charter framed and enacted by the
legislature its ordinances passed in obedience to such charters,
are laws of the State within such municipalities." In Grand
Ave. Ry. Co. v. Lindell Ry. Co. 148 Mo. l. c. 645, the same
judge said:   "When it is considered that the people of a State
have confided the subject-matter of street railways in her

streets and highways, exclusively to the city, that such control and regulation is a matter strictly within the municipal regulation, the ordinances of a city, adopted in pursuance of its charter, granted by the State, have the force and effect of laws within said city, and are binding upon all persons who come within the scope of their operation, so long as they are not in conflict with the Constitution, and are in harmony with the general laws and policy of the State;" and as we find nothing in this ordinance which militates against the Constitution or general laws of the State, so say we in the case at bar.

The writ of ouster is therefore denied.    All concur.