THE STATE EX REL. HARRY L. HUSSMAN REFRIGERATOR & SUPPLY COMPANY v. CITY OF ST. LOUIS and EDMUND R. KINSEY ET AL., Constituting BOARD OF PUBLIC SERVICE of City of St. Louis.—5 S. W. (2d) 1080.

Court en Banc, March 17, 1928.

498

*Jourdan & English* for relator.

*Julius T. Muench* and *Oliver Senti* for respondents; *Benjamin H. Charles* of counsel.

ATWOOD, J.—Upon return to our writ of *certiorari* issued herein relator seeks to quash the record of respondents, who constitute the Board of Public Service of the City of St. Louis, authorizing the improvement of Leffingwell Avenue from Madison Avenue to St. Louis Avenue in said city and the assessment of a special tax against relator's real estate within the area of the designated taxing district. A companion case, No. 28364, State ex rel. Rosebrough Monument Company, relator, against the above-named respondents, relating to

504

similar improvement of property located at the southeast corner of Twentieth and Olive Streets in said city, has also been submitted. The proceedings relative to both improvements were had in accordance with the provisions of the Charter of the City of St. Louis as amended at the election held April 5, 1927, and their validity is challenged on the ground that such amendments are invalid. Particular attention is directed to Amendment No. 5, which empowers the Board of Aldermen. on recommendation of the Board of Public Service, to authorize public work or improvements and establish a benefit or taxing district thereof in the same ordinance; to Amendment No. 3, which provides that any ordinance authorizing public work or improvements, or repairs thereof, or establishing a benefit or taxing district or sewer district, or joint sewer district, shall be an emergency measure; and to Amendment No. 6, which provides that the cost of improving public highways, streets and boulevards shall be paid by special tax bills, one-fourth against abutting property and the remaining three-fourths against all property, by area, in the benefit or taxing district, and providing that a portion of the cost may be paid by the city. It is not contended that the proceedings are void if the charter amendments of April 5, 1927, are valid.

The first proposition advanced by relator in the instant case is as follows: "Amendments to the Charter of St. Louis may be made only as specified in the Constitution." If this is intended to be an accurate and complete statement of the law it might well be qualified irrespective of whether or not the power to frame and adopt a charter includes the power to amend the same. The power to make and amend city charters is a legislative function originally exercised by the State (Morrow v. Kansas City. 186 Mo. 675, l. c. 683), and any such power not delegated to municipalities remains in the State subject to further exercise or delegation by the State. In Pitman v. Drabelle, 267 Mo. 78, l. c. 84, we said: "The Constitution of Missouri is only limitative of the plenary power to legislate reserved to the people of the State. who may exercise it through the law-making body, or its auxiliaries in government, or by the initiative except to the extent they have restrained themselves by the prohibitions of the Constitution." However. the proposition stated by relator has no practical bearing in the determination of this case. The issue, broadly stated, is whether or not the method followed in amending the Charter on April 5, 1927, is authorized by law, and considered in the light of relator's fifth contention that "no amendment to the St. Louis Charter is permissible under the Charter of 1914 itself, except by initiative petition," relator's proposition first above stated seems inconsistent with this subsequent contention and irrelevant to the issue presented. The real question, as it will presently appear, is whether or not a constitutional

provision admittedly applicable in the amendment of the old charter of 1876 is likewise applicable to the present charter subsequently adopted.

Counsel for relators in the two cases are not agreed as to particular constitutional provision, if any, which authorizes amendments to the present charter of the city of St. Louis. In the companion case, No. 28364, relator says it is Section 17 of Article IX, while relator in the instant case says Section 17 extends no such authority. The question thus raised must be answered preliminary to a further consideration of the case.

Section 17, Article IX, of the Constitution, as amended in 1920, expressly limits its application to charters "framed and adopted under the authority of Section 16 of Article IX of this Constitution." A charter for the city of St. Louis was framed, submitted and ratified in 1876. Section 20, Article IX, of the Constitution of 1875 is entitled, "City of St. Louis, extension of limits, adoption of charter," and its language is so definite, specific and apropos as to the proposal, submission and ratification of a scheme and charter for the separation of the city of St. Louis from the county of St. Louis and for the government of said city as to leave no room for doubt that this charter was framed and adopted by authority of Section 20 and not Section 16 of the Constitution, and this court has several times so held. For instance, in City of St. Louis v. Sternberg, 69 Mo. 289, l. c. 297, we said: "It will be observed that in Article 9 of the Constitution, under the head of 'Counties, Cities and Towns,' St. Louis is singled out from all the other cities and towns in the State, and Sections 20, 21, 22, 23, 24 and 25, of the article, contain provisions relating exclusively to it." Also, in Kansas City v. Stegmiller, 151 Mo. 189, l. c. 204: "Again we think it is plain that the framers of the Constitution *ex vi termini* excluded from its legislative classification the city of St. Louis, which is expressly authorized to adopt its own scheme and charter, and all such cities as it authorized by Section 16, Article IX, to frame and adopt their own charters." Also, in State ex rel. v. Clayton, 226 Mo. 292, l. c. 302: "St. Louis has its charter under Sections 20, 21, 22 and 23 of Article 9, and Kansas City under Sections 16 and 17 of that article." Again in Lefman v. Schuler, 296 S. W. l. c. 810, this court, en banc, said: "It also appears that the Scheme of Separation and said Charter of 1876 were adopted under and by virtue of authority conferred by Section 20 of Article 9 of the Constitution of Missouri adopted in 1875."

The Constitution of 1875, however, contained no provision for the subsequent submission of any other charter. This omission was sup-

plied by amendment of Section 22, Article IX, in 1902, and in 1914 the present charter of the city of St. Louis was framed, submitted and ratified under Section 22 as amended. New Section 8854, Laws of Missouri, First Extra Session, 1921, page 110, is as follows: "Any city of this State which now has or shall hereafter attain a population of more than 100,000 inhabitants may frame and adopt or amend a charter for its own government by complying with the provisions of new Sections 16 and 17, Article IX, of the Constitution of Missouri, adopted November 2, 1920, as the same now are, or as they shall be when hereafter amended." Relator in case No. 28364 insists that the city of St. Louis may under this act of the General Assembly amend its present charter by complying with the provisions of Section 17, Article IX, of the Constitution, but this act of the General Assembly cannot be given a broader construction than the terms of the constitutional provisions to which it refers. As heretofore indicated Section 17 limits its application to charters "framed and adopted under the authority of Section 16." In State ex inf. Attorney-General v. Maitland, 296 Mo. 338, l. c. 352, a majority of the court, en banc, held that Section 17 "could have no reference to charters adopted under the Constitution prior to the Amendment of November 2, 1920." As the present charter was not framed and adopted under the authority of Section 16 it cannot be amended by complying with the provisions of Section 17.

We thus agree with the second and third propositions advanced by relator, to-wit, that the city of St. Louis derives its corporate existence and charter powers exclusively under Sections 20 to 23, both inclusive, of Article IX of the Constitution, and that the present charter cannot be amended under Section 17 of Article IX of the Constitution.

Relator's fourth contention is that "Article IX, Section 22, relating to St. Louis, does not authorize an amendment of the Charter of 1914, because the present charter superseded the charter 'so ratified' in 1876, and the Charter of 1876, ratified in connection with the separation of St. Louis from St. Louis County, was the only charter to which amendments were authorized." Old Section 22 ratified as a part of the Constitution of 1875 read as follows:

"The charter so ratified may be amended at intervals of not less than two years, by proposals therefor, submitted by the law-making authorities of the city to the qualified voters thereof at a general or special election, held at least sixty days after the publication of such proposals, and accepted by at least three-fifths of the qualified voters voting thereat."

Section 22 as amended in 1902 reads as follows:

"The charter so ratified may be amended by proposals therefor submitted by the lawmaking authorities of the city to the qualified voters thereof, at a general or special election held at least sixty days after the publication of such proposals and accepted by three-fifths of the qualified voters voting for or against each of said amendments so submitted; and the lawmaking authorities of such city may order an election by the qualified voters of the city of a board of thirteen freeholders of such city to prepare a new charter for such city, which said charter shall be in harmony with and subject to the Constitution and laws of the State, and shall provide, among other things, for a chief executive and at least one house of legislation to be elected by a general ticket. Said revised charter shall be submitted to the qualified voters of such city at an election to be held not less than twenty nor more than thirty days after the order therefor, and if a majority of such qualified voters voting at such election ratify such charter, then said charter shall become the organic law of such city, and sixty days thereafter shall take effect and supersede the charter of such city and all special laws inconsistent therewith."

Relator's contention that the Constitution provides no method for amending the present charter of the city of St. Louis by legislative proposal by its law-making body is apparently based upon such an interpretation of the words "the charter so ratified," used in above Section 22 as amended in 1902, that they would not include any other charter thereafter ratified. Had the Constitution of 1875 provided for the framing, submission and ratification of new charters subsequent to the one therein specifically mentioned we think it could not well be contended that these same words which appeared in old Section 22 would not have been sufficiently broad to include any charter subsequently ratified, as well as the one which was ratified in 1876. An exclusively retrospective application of these words which relator insists must be attributed to their use in Section 22 as amended in 1902 would have made their use in old Section 22 ridiculous, because the charter subsequently ratified in 1876 was not in existence at that time. Therefore, the conclusion which might be properly drawn from the Constitution of 1875, that old Section 22 referred only to the charter which was subsequently ratified in 1876, would be justified not by any narrow construction which the use of these words might be thought to imply, but by the fact that there was then no constitutional provision for any other charter.

But this situation was changed when old Section 22 was amended in 1902. Provision was thereby made for the submission and ratification of a new charter. It matters not that old Section 22 providing for amendments, shorn of the provision that they should be "at intervals of not less than two years," was carried forward almost *verbatim* into the section as amended and placed at the beginning

rather than at the end of the section. The logical order apparently would have been to provide first for the framing, submission and ratification of a charter and then for amendments, but in the actual practice of drafting an amendment it is not unusual for the new matter in an amended section to follow instead of precede the old matter carried forward into the section as amended, irrespective of what might otherwise be deemed the logical order. The subjects of the amendment, to-wit, charters and amendments, definitely appear, and we must presume that they were intended to be adequately dealt with. As a matter of fact it was not until some twelve years later that the new power thereby conferred was exercised by the city of St. Louis, and of course it was not intended that as long as the old charter was in force and effect it could not be amended. However, this new power might have been exercised immediately, and it is not to be supposed that in conferring the power to frame, submit and ratify a new charter the probable need of amendments thereto was overlooked and the power of amendment limited to the old charter. Certainly it was not intended that the new charter when ratified would be in worse plight than the old one with respect to the possibility of its being kept abreast of changing conditions and future needs by amendments, and it will hardly be urged that the constitutional amendment of 1902 anticipated that the new charter would itself contain, as did the Charter of 1914, a provision for its amendment by the exercise of a power "known as the initiative."

Furthermore, when the charter-framers in 1914, by Section 1, Article V, of that instrument, provided for amendment by initiative proposal they evidently assumed that the city also had the power, under Section 22, Article IX, of the Constitution as amended in 1902, to amend its new charter in the same manner as of old "by proposals therefor submitted by the lawmaking authorities of the city to the qualified voters thereof, etc," for this section of the new charter reads: "The people shall have power at their option to propose ordinances, including ordinances proposing amendments to this charter, and to adopt the same at the polls, with the same effect as if adopted by the Board of Aldermen and approved by the Mayor." If the Board of Aldermen had no power to propose charter amendments to the qualified voters of the city then this language asserting that the people shall have "power at their option" to propose amendments to the charter "with the same effect, etc.," is meaningless. Doubtless it will be conceded that the constitutional delegation of power to frame a new charter included delegation of power to indicate a method or methods of amending the same, and in above Section 1, Article V, of the new charter we find an exercise of this power in a clear recognition of the existence of the method of amendment by voting on

legislative proposals therefor, and in the indication of an additional method through the exercise of the people's power "at their option" to initiate proposals for amendments. The particular terms of this reservation of power in the people do not preclude a similar exercise of the power in the law-making authorities of the city to propose amendments. The two methods of proposing amendments are here recognized, and they are clearly coexistent. As a matter of fact, in upholding the constitutionality of this initiative provision in the Charter of 1914 we inferentially held in Pitman v. Drabelle, 267 Mo. 78, l. c. 85, that the new charter could be amended under Section 22, Article IX, of the Constitution, as follows:

"The crux of this case is whether the inclusion in the amended charter of the provisions giving to the people the *additional* right to legislate by the initiative plan is prohibited by the language of the Constitution (Art. 9, sec. 22), which provides for the amendment of the charter of the city of St. Louis."

The foregoing considerations, in our judgment, far outweigh any speculation that the constitutional amendment of 1902 contemplated that the new charter would itself provide the methods of amendment, as well as relator's suggestion of the ease with which the words "so ratified" might have been left out or the words "any charter" put in. It is obvious that the new charter superseded and took the place of the old charter ratified in 1876 and every provision of the amended Constitution relating to the old charter applies to the new one. The intent is reasonably clear and mere choice of words is not important. We are here concerned with what under the general rules of construction this constitutional provision must be deemed to have said. "The organic law is subject to the same general rules of construction as other laws, due regard being had to the broader objects and scope of the former, as a charter of popular government. The intent of such an instrument is the prime object to be attained in construing it." [State ex rel. v. McGowan, 138 Mo. l. c. 192.] The present charter of the city of St. Louis may be amended by "proposals therefor submitted by the law-making authorities of the city to the qualified voters thereof" as provided in Section 22, Article IX of the Constitution. It is not contended that the charter amendments in question were not submitted and adopted in accordance with this constitutional provision, and their validity in this respect is upheld.

Relator next suggests that the form of submission and ballot was not "such as to allow the voter to act thereon intelligently," citing State ex inf. v. Maitland, 296 Mo. 338. Amendments numbered 3, 5 and 6 are thus criticised. Ordinance No. 35368 submitting the proposed amendments, among other things, provided that "the qualified voters of the city may, at the election aforesaid, deposit a printed ballot in this form:

Amendment Number Three to the City Charter: Article Four, Section Twenty, relating to Emergency Ordinances. Yes. No. . . . . . Amendment Number Five to the City Charter: Article Twenty-two, Section Three, relating to Ordinances for Public Work. Yes. No. Amendment Number Six to the City Charter: Article Twenty-two, Section Ten, relating to Assessments for the improvement of Public Highways. Yes. No.'' The ballot as printed by the Board of Election Commissioners, with reference to these three amendments, was as follows:

"Amendment to the Charter of the City of St. Louis.

## "AMENDMENT NUMBER THREE.

"Submitted by Ordinance No. 35368, approved
November 24, 1926.

"AMENDMENT OF Section Twenty of Article Four of the Charter of the City of St. Louis, providing that any ordinance authorizing public work or improvements, or repairs thereof, or establishing a benefit or taxing district, or sewer district, or joint sewer district, shall be an emergency measure.

**YES**
**NO**
(To vote for said amendment the voter shall strike out the word 'No,' and to vote against it the voter shall strike out the word 'Yes.')

## "AMENDMENT NUMBER FIVE.

"Submitted by Ordinance No. 35368, approved
November 24, 1926.

"AMENDMENT of Section Three of Article Twenty-two of the Charter of the City of St. Louis, empowering the Board of Aldermen, on recommendation of the Board of Public Service, to authorize public work or improvements and establish a benefit or taxing district thereof in the same ordinance.

**YES**
**NO**
(To vote for said amendment the voter shall strike out the word 'No' and to vote against it the voter shall strike out the word 'Yes')

"AMENDMENT NUMBER SIX. .

"Submitted by Ordinance No. 35368, approved
November 24, 1926.

"AMENDMENT of Article Twenty-two of the charter of the City of St. Louis by repealing Section Ten thereof and enacting a new section providing that the cost of improving public highways, streets and boulevards shall be paid by special tax bills, one-fourth against abutting property and the remaining three-fourths against all property, by area, in the benefit or taxing district, and providing that a portion of the cost may be paid by the city.

YES

NO

(To vote for said amendment the voter shall strike out the word 'No,' and to vote against it the voter shall strike out the word 'Yes.')

It does not appear that there was such a variance between the form of ballot indicated by the ordinance and the ballot that was actually published as would invalidate the proceedings, nor does it appear that the ballot was so framed as not to allow the voters to act intelligently on any amendment submitted, as required in State ex inf. v. Maitland, supra. This case comes within the rule thus laid down in 20 Corpus Juris, page 150: "In voting for constitutional amendments and propositions of all sorts which are submitted to popular vote, it is not customary to print *in extenso* upon the ballot the thing to be voted for, but it is sufficient if enough is printed to identify the amendment and show its character and purpose." See, also, Nance v. Kearbey, 251 Mo. 374, and State ex inf. Barrett v. Imhoff, 291 Mo. 603. This objection is ruled against relator.

Relator's seventh and final contention noted in its principal brief is that "the amendments in this case are void because of the failure to follow the requirement of the ordinance that it be published in the papers doing the city printing." The only constitutional requirement in point is that part of Section 22, Article IX, which provides that amendments may be submitted "at a general or special election held at least sixty days after the publication of such proposals." The matter of publication is not covered by any statute, but Section 3 of Ordinance No. 35368 proposing the amendments reads as follows:

"Upon the approval of this ordinance it shall be published in the papers doing the city printing, and the Mayor shall cause

copies thereof to be printed in appropriate form and distributed among the voters before and at the election.''

This ordinance was published in a weekly paper printed and circulated in the city of St. Louis and known as The City Journal more than sixty days before the election was held at which the amendments were voted upon. Section 30 of Article XV of the City Charter states that ''provision may be made by ordinance for the city doing its own printing and publishing.'' The record in this case shows that The City Journal was then, and since May 11, 1918, had been, designated by ordinance, adopted pursuant to the above charter provision, as ''The official publication of the city of St. Louis, Missouri,'' in which should be published ''all publications, notices and advertisements and other matters whatsoever which the city now publishes or may hereafter by ordinance require to be published.'' The record does not disclose that any other paper was ''doing the city printing'' when the aforesaid publication was made, although in relator's brief it is said that where work exceeds the cost of $10,000 a daily newspaper is used ''to do the city's advertising for bids.'' The record further shows that a copy of said ballot was published on the 28th day of March, 1927, and on April 4, 1927, in the St. Louis Post-Dispatch and the St. Louis Times, daily newspapers published in the city of St. Louis. Also, that at the general election held in said city on April 5, 1927, more than 70,000 qualified voters appeared and voted at said election for city officers then to be elected, and of said voters 30,627 voted ''yes'' and 18,326 voted ''no'' on said Amendment No. 3; 29,785 voted ''yes'' and 18,782 voted ''no'' on said Amendment No. 5; and that 30,059 voted ''yes'' and 18,559 voted ''no'' on said Amendment No. 6: all of said votes being in the form of the printed ballot hereinabove set out. Section 21, Article IV, of the Charter provides that ''every ordinance shall be published within ten days after its approval by the Mayor or adoption over his veto in the paper or papers doing the city publishing.'' It thus appears that under the Charter publication in more than one paper was not required if in fact only one paper was ''doing the city publishing.'' This is also the only reasonable construction to be placed on above-quoted Section 3 of Ordinance No. 35368. It may be that the city sometimes advertised for bids in daily papers, especially when required by law to do so, but the record is convincing that at the time this publication was made in the City Journal, more than sixty days before the election was held, this paper was ''doing the city printing,'' and no other paper is shown to have been so engaged. The publication made in this paper contravenes no provision of the constitutional or statutory law, and is in substantial compliance with the ordinance requirement. Relator says that The City Journal was not a paper designed to give to the proposed amendments the wide publicity contemplated by the or-

dinance. No particular paper was named and we do not know just how wide was the publicity contemplated in this publication of the ordinance, but the publication made was the same as that made of every other ordinance adopted by the city, and it complied with all legal requirements. The vote that was actually polled at the election precludes the supposition that there was any lack of publicity. While publication of the ballot in the metropolitan dailies above mentioned on March 28 and April 4, 1927, preceding the election, does not constitute a legal publication, yet it bears on the question of the publicity actually given, and on the same question we will not close our eyes to the generally known fact that such matters are given wide publicity as news through the press regardless of paid official publication. There is no charge of fraud or injury done by reason of the legal publication made, and we see no reason to question its validity. [Fahey v. Hackmann, 291 Mo. 359; State ex inf. Barrett v. Imhoff, 291 Mo. 603; State ex inf. v. Kansas City, 233 Mo. 162; State ex rel. v. Gordon, 217 Mo. 103.]

In reply brief this relator does suggest, and relator in companion case No. 28364, in a separate point vigorously urges, that Amendment No. 3 is invalid on the ground that "the charter cannot delegate to the Board of Aldermen the determination of what shall constitute emergencies," citing State ex rel. v. Maitland, 296 Mo. 338, 1. c. 355; and State ex rel. v. Becker, 233 S. W. 641, 1. c. 644. As a matter of fact, an examination of the charter as amended in 1927 discloses that it does not delegate to the Board of Aldermen the broad determination of what shall constitute emergency measures, but in very definite terms indicates what may be deemed such.

A careful examination of the cases above cited fails to disclose any inhibition of what is here objected to as a redelegation of power. Our rulings in these cases were directed solely to the preservation of the right of referendum reserved to the people by Section 57, Article IV, of the Constitution. by a construction of the words "public peace. health or safety, etc.." as therein used. In order to preserve this right we held that whether or not a law was "necessary for the immediate preservation of the public peace, health or safety." was a matter for judicial determination, and such was the extent of our ruling. We did not undertake to withdraw any other question from the field of legislative determination, and the other exceptions named in the same section are unaffected by our rulings. Conceding for the sake of argument. but for such purpose only and without so ruling. that the cases cited have any application in construing Section 20. Article IV, of the City Charter as amended by the adoption of Amendment No. Three. we think it could only be by analogous construction with reference to the clause defining an emergency measure as "any ordinance necessary for the immediate preserva-

tion of the public peace, health or safety, . . . and declared to be an emergency measure." But, Section 20, Article IV, of the Charter as amended further provides that an "emergency measure" may also be any ordinance "providing for public work or improvements of any kind or repairs thereof, or establishing a ·benefit or taxing district or a sewer district, or a joint sewer district, and declared to be an emergency measure." The ordinance in question provides for street improvement and the establishing therefor of a benefit or taxing district and by its terms was "declared to be an emergency measure." As an emergency measure it is not necessary to hold that it falls within the class of laws "necessary for the immediate preservation of the public peace, health or safety" which is the only class of laws in Section 57, Article IV, of the State Constitution ruled upon in the above-cited cases. Hence their inapplicability in the determination of this case.

If we treat the foregoing objection to Amendment Number Three as questioning the validity of this amendment on the ground that it creates an exception to the operation of the power to refer not specified in Section 57 of Article IV of the Constitution, it is worthy of some further consideration. Bearing in mind that the authority of the city of St. Louis to frame and adopt a charter is derived from a constitutional provision and not from an act of the General Assembly, we must also remember that in our State Constitution, unlike the Federal Constitution, powers are only defined or delimited. [State ex rel. v. Burton, 266 Mo. 711, 1. c. 717.] Consequently, we must look well to the exact terms of limitation and stay within their meaning. Section 1 of Article IV of the Constitution reads:

"*The legislative power*, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled 'The General Assembly of the State of Missouri.' "

A limitation on this section contained in the Constitution as then adopted appears in Section 20, Article IX, authorizing the city of St. Louis to frame and adopt a charter "in harmony with and subject to the Constitution and laws of Missouri." This charter-making power was not otherwise delimited except in the requirement that the charter provide for a chief executive and two houses of legislation, one of which should be elected by general ticket. This section further provided that such charter should be "the organic law of the city." This limitation upon above Section 1, Article IV, was carried forward in the amendment adopted in 1902, now appearing as Section 22, Article IX, of the Constitution. It authorized the city of St. Louis to frame and adopt a new charter "which said charter shall be in harmony with and subject to the Constitution and laws of the State, and shall provide, among other things, for a chief executive and at least one house of legislation to be elected by general ticket." The power to frame and adopt

such charter was not otherwise delimited, and it was under this section that the charter of 1914 was framed and adopted and in 1927 amended.

The next limitation upon above Section 1, Article IV, pertinent to the present inquiry, is the initiative and referendum amendment adopted in 1908, and now appearing as Section 57, Article IV, of the Constitution. The first clause of this section reads: "The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, . . . . ." Standing on a parity with Section 1, Article IV, and Sections 20 and 22, Article IX, of the Constitution, and considered alone, this clause neither adds to nor detracts from the plain meaning of these other constitutional provisions. But a delimitation immediately follows thus (italics ours): "but the *people reserve* to themselves *power to propose laws and amendments to the* Constitution, and *to enact or reject the same at the polls, independent of the legislative assembly, and* also reserve power at their own option *to approve or reject at the polls any act of the legislative assembly.*" Even if we apply this definition or delimitation of the legislative power the most liberal rule of construction possible, although it should be strictly construed (State v. Wilson, 265 Mo. 1), it is still inconceivable that the reservation of power extends a whit beyond its plain and unequivocal terms, to-wit, "to propose laws and amendments to the Constitution, . . . to enact the same at the polls, independent of the legislative assembly, and . . . to approve or reject at the polls any act of the legislative assembly." There is not the slightest reference, either express or implied, to that other and previous delimitation of "the legislative power" contained in Sections 20 and 22, Article IX, of the Constitution provisions of equal sanction and authority, by which the city of St. Louis is authorized to frame and adopt a charter or "organic law" without any restrictions whatever except such as are specified in such provisions. It is true that Section 57, Article IV, excepts certain kinds of laws from the operation of the powers so reserved, which exceptions we have judicially construed to be exclusive, and it is also true that the charter of the city of St. Louis must be "in harmony with the Constitution and laws" of the State, but the force of the exceptions stated in Section 57, Article IV, cannot extend beyond the scope of the powers reserved, which insofar as the power of the referendum is concerned is plainly *acts of the state legislative assembly.* We therefore hold that the provisions of Amendment Number Three to the Charter of the City of St. Louis do not in the respect above noted contravene Section 57, Article IV, of the State Constitution.

For the reasons above stated our writ is quashed and the proceeding is dismissed. *Walker, C. J.,* and *Blair, J.,* concur; *White, J.,*

516

concurs in separate opinion; *Ragland*, J., concurs in the result; *Graves, J.*, dissents in separate opinion, in which *Gantt, J.*, concurs.

WHITE, J., (concurring).—I concur in all points discussed in the majority opinion, but on account of conflicting views as to the city's constitutional power to amend its charter it may not be inappropriate to consider a little more fully some points discussed.

I. It is said that the amendments. to the Charter of the City of St. Louis, under consideration, are null and void because of the inability of St. Louis to amend the Charter of 1914. This contention is based upon the wording of Section 22, relating to the original charter adopted by the city, where it provides that "the charter so ratified" may be amended. The argument is that the expression "so ratified" limits the amendments to the particular charter, originally adopted under Section 20, Article IX, of the Constitution; that the power to amend cannot apply to any subsequent charter, such as the charter of 1914.

Section 22, Article IX, of the Constitution, relating to St. Louis, was repealed, and a new section adopted in 1902. Before that amendment how did the Constitution stand with relation to the first charter as adopted?

Section 22, and the first clause of Section 23, applicable at that time, are as follows:

"Section 22. The charter so ratified may be amended at intervals of not less than two years, by proposals therefor, submitted by the law-making authorities of the city to the qualified voters thereof at a general or special election, held at least sixty days after the publication of such proposals, and accepted by at least three-fifths of the qualified voters voting thereat.

"Section 23. Such charter and amendments shall always be in harmony with, and subject to the Constitution and laws of Missouri. except only, that provision may be made for the graduation of the rate of taxation for city purposes in portions of the city which are added thereto by the proposed enlargement of its boundaries," etc.

Section 22 provided: "The charter *so ratified* may be amended at intervals of not less than two years."

Here is direct grant of power to amend the charter. not once. but as many times as desired. providing that it shall not occur oftener than once in two years.

Then Section 23 provides that such ". . . charter and *amendments* shall *always* be in harmony with and subject to the Constitution."

There again it is contemplated that amendments may be more than one, and the continuing power implied in the original grant is reinforced by the use of the word "always." Not once, but every time. There can be no question and it is not suggested, that as the Constitution then stood the people of the city of St. Louis had authority to amend their charter as often as desired, with the limitation mentioned. The method of amendment is provided; it is initiated by the legislative authorities.

Section 22 was amended in 1902, to read, the first part, as follows:

"The charter so ratified may be amended by the proposals therefor submitted by the law-making authorities of the city to the qualified voters thereof, at a general or special election," etc.

Now the argument is that the expression "so ratified" limited the amendment to the original charter adopted by the city. It must be conceded that it had no such effect *before* the amendment. Then how was it possible for the amendment of 1902 to change the meaning of those words? If, as the Constitution now stands, the charter "so ratified" means only the original charter, it must have meant that when it was adopted. That expression was not given a different meaning by anything in the amendment to Section 22.

The amendment omits the expression "at intervals of not less than two years." How can it be said that that affects the result claimed? Those words contain no grant of power. They were a limitation upon the power granted. "The charter so ratified may be amended," was in the original Section 22, and it is in the amended Section 22. That was the grant of power. The limitation was in the original. Removing the limitation would not weaken the force of the grant, since it appears in the same words in the amendment.

The only difference between the original and the amended Section 22, so far as the power to amend is concerned, is that the limit to once in two years is removed, and the people may amend as often as they please.

In Morrow v. Kansas City, 186 Mo. 675, it was held (l. c. 686), quoting from another case: "The power to *frame* a charter for themselves is a *continuing* right vested in the voters of the city, and it does not become exhausted because once exercised."

For the same reason the power to *amend* a charter, once granted, is a continuing one and is not exhausted by one amendment. In fact, Section 22 provides for "proposals" in the plural.

518

II. But it is argued that the second clause of the first sentence of Section 22 as amended takes away that power to amend because it provides that the law-making authorities may order an election of thirteen freeholders to frame a new charter which shall be submitted to the voters.

As Section 22 stood before the amendment of 1902, there was no provision for adopting a *new* charter. There was only the provision for amendments as quoted above.

It is said that when the first charter was adopted under old Section 22, it was done under conditions in connection with the county which could never occur again, and therefore the power to *frame* a charter in the first place was not a continuing one, because a different method must thereafter be employed. I do not think that conclusion is sound, but let it be conceded.

The amendment did provide a method for framing a new charter. Already the power to *amend* was there, and the power to frame a new charter was added. The framers of the amendment doubtless understood the power to amend did not include the power to frame a new charter. Then, how can it be said that a grant of that additional power took away the authority already possessed, when the two are different and do not conflict? It is argued that, because the power to frame a new charter comes *after* the power to amend, in the same sentence, the power to amend cannot apply to a new charter framed under the latter clause and can apply only to the charter already in existence. Why? An amendment to a statute or constitutional provision usually is placed *after* the part to which it is added. Here is authority to do two things, and different methods provided for doing them; a new charter framed by thirteen elected freeholders; amendments by proposals submitted by the legislative branch. They exist side by side, each a grant of power which, under the authority of the Morrow case, is continuing. The power to amend applies to any charter in force at the time the amendment is offered.

III. It is further argued that in adopting the charter the people of St. Louis could have provided in the charter itself the power to amend, but that they did not do so except by the initiative. Section 1, Article V, of the Charter is pointed to. It is as follows:

"Section 1. The people shall have power at their option to propose ordinances, including ordinances proposing amendments to this charter, and to adopt the same at the polls, *with the same effect as if adopted by the Board of Aldermen and approved by the Mayor.*"

If the people may by the initiative propose amendments to the charter and adopt the same with the *same effect* as if adopted by

the Board of Aldermen, then this is not a distinctive and exclusive method of proposing amendments to the charter. The argument implies that the people may propose amendments and adopt them with *greater effect* than if proposed by the Board of Aldermen. The people, by initiative, have exactly the same power to propose and adopt ordinances and amendments to the charter that the Board of Aldermen and the Mayor have; and no more.

That expression "the same effect" evidently refers to a power which the freeholders thought the city had, which they had reason to believe they had provided for. Section 1, Article 1, of the Charter, in the enumeration of the city's corporate powers, in item 35, says:

"To exercise all powers granted or not prohibited to it by law, or which it would be competent for this charter to enumerate."

Here the city is granted all the powers not prohibited to it by law. That would include power to amend its charter. It is granted all powers "which it would be competent for this charter to enumerate." It is expressly conceded that in adopting their charter the people had authority to provide for amendments. If it was competent to enumerate such authority in the charter, then the city had such authority as if it were enumerated. It cannot be said that this power expressed in specification number 35, is limited by the intiative provision quoted, because in that provision the power of initiative is put in exactly the same rank as the power exercised by the city authorities. So, it is entirely competent for the city authorities in the usual manner of elections to provide for amendments to the charter as authorized by the charter itself. The freeholders plainly did not intend to surrender a power which it is conceded the city had, to amend, and thus render it helpless to keep abreast of changing conditions. In adopting a charter they did not intend to give the city less power than possessed by other and less pretentious cities. Therefore, the charter-makers of 1914 asserted and retained the right to *"exercise all powers . . . not prohibited to it by law"* . . . and, *"which it would be competent for the charter to enumerate."*

With that general statement of its powers, unlimited, unless by express provision of the Constitution or some statute as to the character of the amendment, can it be said that the people of the city of St. Louis or the framers of its charter intended to tie up the city to an organic law which might soon become ill adapted to the changing conditions of a progressive community?

IV. The objection to the referendum provisions of the Charter of St. Louis, if sound, would make Section 57, Article IV, of the Constitution apply, not merely in its general spirit and purpose, but in every detail, to the passage of every ordinance in every city, town and village in the State. Ah, they say, the attack is upon Section 20, Article IV, of the *Charter*. But the sole objection to that section of the Charter is that it provides a method of *referring ordinances,* differing in some details from the method of referring *statutes,* provided in Section 57, Article IV, of the Constitution. The argument against the charter section ignores the subject with which it deals, the passage of *ordinances,* the reserved right of the people to vote on *ordinances* and nothing else; *not statutes, nor charter amendments.* A solution of the question presented is impossible without keeping that matter in mind. The authorities cited all relate to statutes, and none of them to ordinances.

A subject of this character may be considered in two ways—a small way and a large way; in detail and in its general proportions and relations to other subjects. Both methods are useful here in comparing initiative-referendum provisions of the Charter to similar provisions in the Constitution, to see whether there is a conflict. It must be kept in mind that one deals with statutes and the other deals with *ordinances.*

In the terms used there is no conflict. "Statute" does not mean "ordinance." "The legislative assembly" does not mean a "city council." No general words are used in Section 57, Article IV, which could make the terms used apply to anything else than statutes, although general terms might have been used. There is no language in Section 57 which shows an intention to make the limitations and reservations therein apply to any enactment whatever except acts of the State Legislature. Thus there is no conflict in the details. Section 57, Article IV, is self-operative. It acts directly upon the original source of legislative power. No city ordinance can be put in force except through *some legislative* authority. A statute owes its validity to original constitutional sanction; an ordinance depends upon delegated authority for its validity. This distinction is important here, for Section 57 does not authorize any legislation to put the referendum into effect in cities or elsewhere. Authority for such legislation must be found in other sections of the Constitution, as I will presently show. The details in applying Section 57 to the enactment of a statute are wholly inapplicable to an ordinance. In order to make it apply to an ordinance it would have been necessary by some affirmative command to provide a method for it.

Now consider Section 57, Article IV, in its relation to other provisions of the Constitution. A great deal is said about the power

inherent in the people which they reserved to themselves through the referendum. The principal concern here is with the power which the people of the State have granted to St. Louis. That city seems to have been a special favorite of the Constitution-makers, for no less than six sections are devoted to the charter which St. Louis might frame and adopt for its government. Those sections provide for certain features in the form of government for the city, but there is no provision requiring the city to include a referendum among its charter features. In framing a charter it could have omitted the referendum altogether. It was required to provide for certain things, but *not* that. It could put whatever it pleased in the charter, subject only to general laws and constitutional provision relating to the whole State. In the management of purely corporate functions, not governmental in character, it has a free hand.

The power to frame a new charter was granted by the amendment of 1902, and in 1908 the initiative-referendum Section 57 was adopted. If it had been the intention to limit the city as to any features of a charter it should frame, it would have been easy to say so then. No restriction there or elsewhere, then or at any other time, was pronounced, *limiting* the authority of St. Louis in framing the "fundamental law" for its government, or directing what such charter should or should not contain other than set forth in Sections 20-25, Article IX, of the Constitution. Therefore St. Louis had authority to frame a charter without a limiting referendum. Then, it follows that if the city could leave out the referendum feature altogether, it could adopt a referendum provision and make it apply to such ordinances as it pleased. It could exclude its operation from all matters of strictly municipal concern and make it apply only to police power and matters of State concern, and it was nobody's business outside of St. Louis.

V. Section 7, Article IX, of the Constitution provided that the General Assembly *shall provide* by general law for the *organization* and classification of cities.
> "*And the power of each class shall be defined by general laws.*"

The "power" thus to be defined by the Legislature is not limited as to subjects; as to the operation of municipal affairs; as to how ordinances may be put into effect; as to any reservations in the people of the city such as might be provided by the initiative and referendum. Can it be said that the Legislature was vested with more authority in that matter than that possessed by cities organized under special charters? More than was granted to St. Louis directly by the Constitution? On the contrary, all rulings of this court upon the subject declare that the authority to adopt a special charter

and the authority of the Legislature to provide for city governments by general law, are equal; one is as broad as the other. What the General Assembly might do for cities organized under the general law, a city organized under a special charter might do for itself under its constitutional sanction.

We have just been over the subject at this term in the Library case, 318 Mo. 870, and the "Zoo" case, 318 Mo. 910. In those cases St. Louis claimed greater authority than other cities possess, and we were obliged to hold it down to equality with them.

The Legislature, in dealing with the subject providing for "powers" invested in each class of cities, has provided initiative-referendum features for some cities and *not for others*. For instance, Section 7951, Revised Statutes 1919, provides for the referendum on all ordinances except emergency ordinances, those for the preservation of public peace, health, safety, etc., in cities of the first class. And Section 7990, Revised Statutes 1919, makes a similar provision for cities of the second class.

The real significance of those statutory provisions appears when we find that cities of the third class are of two kinds: those of the third class generally, and those organized under what is termed the alternative form of government. The cities of the general third class are *not provided with the referendum provision anywhere*. While cities of the third class which adopt the alternative provision have Section 8393 providing for the referendum. Thus some cities of the same class, according to the particular statute under which they are organized, have referendum provisions and others have not. Cities of the fourth class have no initiative-referendum provisions.

Now the validity of that distinction, the authority of the Legislature to make it, has never been questioned. It could not successfully be questioned, because the Legislature had authority to define the power of each class. "Power" means authority to enact ordinances and put them in operation with or without a referendum.

The necessary inference is that a city organized under a special charter, under its constitutional grants, may provide for a referendum in such terms as the people see fit to adopt.

We are not without authority in support of that proposition. The Charter of Kansas City has a referendum section very similar to the one under consideration here. It provides that an emergency measure, not subject to the referendum, shall be such as is "for the immediate preservation of the public peace, property, health, safety or morals, and *"any ordinance fixing any tax rate or assessment; any ordinance relating to any public improvement to be paid for by special assessment."* The construction of that provision of the Kansas City Charter came before this court, en banc, in case of State

ex rel. Asotsky v. Regan, and the decision is reported in 317 Mo. 1216, 298 S. W. 747. The phrase "any ordinance fixing any rate or assessment" was construed. That expression is not found in Section 57, Article IV, of the Constitution. We held that an ordinance passed in pursuance of that provision of the charter was not referable; that it was an emergency measure. Every member of Court en Banc concurred in that opinion and in that construction, except BLAIR, J., not sitting. That case was fully considered and argued at length. There was no fear *then* that we had departed from previous constructions of Section 57, Article IV, of the Constitution; no suggestion that the Kansas City Charter encroached upon the reserved rights of the people. If that section of the Kansas City Charter is constitutional, the section of the St. Louis Charter under consideration here is constitutional. That ruling was based upon the same decisions of this court which are cited in support of the opposing position here.

As noted above, much has been said regarding the sovereign power residing in the people not granted to the legislative body. The people have the power to amend or abolish their fundamental law, to limit in any manner they please, by a constitutional provision, the authority of the Legislative Assembly. In the initiative-referendum Section 57, the people saw fit to preserve to themselves the right to *vote*, if they desired, on statutes passed by the General Assembly. That is all the referendum means.

The plenary power possessed by the Legislative Assembly enables it to enact statutes which affect personal and property rights, personal liberty, the functions of the courts, elections of executive, legislative and judicial officers. City ordinances are not in the same class, or of the same rank as statutes. They deal with matters of purely municipal corporate concern, in which the State has no interest, and only incidentally can they affect those important rights dealt with by statutes.

A statute is put in force by original constitutional authority; an ordinance by derivative authority. It has not the force behind it that braces a statute.

Thus, there is sufficient reason for reserving to the people of the State the right to vote on statutes which may concern their fundamental rights. There is no such reason why a city should reserve to its people the right to vote on an ordinance which affects a street cleaning contract, or the uniform of policemen, or the laying of a sidewalk along a block on the south side, or opening a street through a block in the west end; these last two being paid for by local assessment and not by general tax. True, some such ordinances might incidentally touch property rights, but such rights are entirely controlled by statutes and common-law principles, all of which are cognizable by State courts.

The construction contended for here would make Section 57, Article IV, apply to all ordinances. There is no reason, nor authority for such a construction.

GRAVES, J., (dissenting).—We prepared a dissent in this case, but a change in the original opinion has rendered a part of what we urged, in great detail, unnecessary. Then we have since also an amended separate concurring opinion, which can now be noticed. We are therefore withdrawing our original dissent and filing in lieu thereof this opinion.

There are two cases pending here. The instant case, and the case of State ex rel. Rosebrough Monument Co., Relator, v. City of St. Louis et al., being our No. 28364. In both cases the amendments to the St. Louis Charter of April 5, 1927, are challenged, although, it might be said, the challenges are upon somewhat different grounds. Each case involves improvements of streets under these charter amendments. The Rosebrough Monument case, supra, having been first assigned to us, the briefs and records in both cases have been used. Between the two cases all the questions we shall discuss have been raised, or are necessarily involved. These questions, as well as those suggested more particularly in the opinions (the principal and concurring opinions in the instant case), now before us, we shall briefly discuss. The questions are of importance, because contractors have to sell their tax bills in order to do such work, and all questions (both Federal and State, if involved), should be determined, rather than leave it to litigation when tax bills are sued upon later. Not only should they be determined, but should be determined right. Of the questions, as we see the records before us, in their order.

I. Counsel in the two cases do not agree as to constitutional sources of power for making amendments to a St. Louis Charter. In the Rosebrough Monument Co. case, supra, it was contended that the power to amend a St. Louis charter came from Sections 16 and 17 of Article IX of our Constitution. The opinion before us, in the instant case, properly rules to the contrary. The constitutional provisions applicable to St. Louis are Sections 20 to 25 (both inclusive) of Article IX of the Constitution. Neither Section 7 nor Sections 16 and 17 of Article IX apply to St. Louis. [City of St. Louis v. Sternberg, 69 Mo. l. c. 297; Kansas City v. Stegmiller, 151 Mo. l. c. 204; State ex rel. v. Mason, 153 Mo. l. c. 52; St. Louis v. Dorr (dissenting opinion of SHERWOOD and BURGESS, JJ.), 145 Mo. l. c. 499; State ex rel. v. Mason, 155 Mo. l. c. 501; City of St. Louis v. Bircher, 76 Mo. l. c. 433-434; State ex rel. v. Clayton, 226 Mo. l. c. 302.]

Thus far we agree to the opinion in the instant case. This is only of importance in that it furnishes us a common ground for discussing the real vital issues. These we shall discuss pointedly and as briefly as we can in the paragraphs following.

II. In this case counsel contend that there is no constitutional authority giving the city the right to amend the charter adopted in 1914 and adopted under the authority of new Section 22 of Article IX, which new Section 22 was adopted in 1902. [Laws 1905, page 320.] The opinion rules contra, and to this ruling we dissent. Some underbrush should be cast aside first. *Let us emphasize here that the question of the right to amend a charter by virtue of constitutional grant to write and adopt a charter is not in this case, because the amendments to the Charter of 1914 (involved here) were not so made.* These charter amendments were originated by city legislative proposal. The power granted to St. Louis to write a charter is by the last part of new Section 22 of Article IX. The grant is to elect thirteen freeholders to write and frame a charter, and then let the people adopt such framed charter. It reads: ''and the lawmaking authorities of of such city may order an election by the qualified voters of the city of a board of thirteen freeholders of such city to prepare a new charter for such city, which said charter shall be in harmony with and subject to the Constitution and laws of the State, and shall provide, among other things, for a chief executive and at least one house of legislation to be elected by general ticket. Said revised charter shall be submitted to the qualified voters of such city at an election to be held not less than twenty nor more than thirty days after the order therefor, and if a majority of such qualified voters voting at such election ratify such charter, then said charter shall become the organic law of such city, and sixty days thereafter shall take effect and supersede the charter of such city and all special laws inconsistent therewith.''

The grant to write is to thirteen freeholders. If this constitutional authority to write covers the right to amend, it means to amend through the same kind of a body as is authorized to write, i. e. a board of thirteen elected freeholders. The constitutional grant to frame a charter also provides for the notice, i. e. not less than twenty nor more than thirty days notice. If the power to amend comes from the grant to write a charter, such power to amend must follow the course (as to notice and otherwise) of the power to write. The vote to adopt is a majority of the qualified voters ''voting at such election.'' The amendments of 1927 to the Charter of 1914 were not made in accordance with the constitutional grant of power to write and adopt a charter, so that, even if a grant of the right to write and adopt a charter carried with it the right to amend,

no attempt was made to thus amend the Charter of 1914, in April, 1927. On the other hand, these amendments were by city legislative proposal, and strictly within the letter of the first clause of new Section 22 of Article IX, which reads:

"The charter so ratified may be amended by proposals therefor submitted by the law-making authorities of the city to the qualified voters thereof, at a general or special election held at least sixty days after the publication of such proposals and accepted by three-fifths of the qualified voters voting for or against each of said amendments so submitted."

There is no contention that these amendments were not proposed and adopted under the constitutional provisions, supra. They were so adopted, and the question here is, whether or not this constitutional provision applies to any charter of St. Louis, except the Charter of 1876. So we repeat, that the question as to whether or not a grant of power to write and adopt a charter, carries with it the right to amend such charter, is not in this case at all, and cannot be under the facts. This underbrush, suggested in briefs, is cast aside.

In the following paragraphs we take up the question suggested in the first lines of this paragraph, but will dispose of a little more underbrush first.

III. In these two cases there is an attempt to give too much weight to mere charter provisions. It would seem that we were trying to revert to the once much pressed view (long since exploded—in fact exploded shortly after its appearance), that the charter of a city (adopted under constitutional grant) was *the constitution* of the little municipality, and stood in a different class to mere legislative charters, such as we have for cities of the first, second, third and fourth classes. We had occasion recently to review this matter in a case that Division One had sent to Court en Banc upon its own motion, because of seeming conflict with a case from Division Two. The conceived conflict had no reference to this question, and hence we use here some thoughts expressed and approved, by Division, in Tremayne v. City of St. Louis, 320 Mo. ——, 6 S. W. (2d) 935. In that case we said:

"We shall take the applicable statutes first, because, in a broad sense, the Charter of St. Louis cannot contravene a state statute. 'Notwithstanding the provisions of this article (Art. IX), the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State.' [Sec. 25, Art. IX, State Constitution.] 'Such charter and amendments' (of the city of St. Louis) 'shall always be in harmony with and *subject to* the *Constitution* and *laws* of Missouri.' [Sec. 23, Art. IX, Const. of Missouri.]

"The making of a city charter, under constitutional authority, is a legislative function. [Morrow v. Kansas City, 186 Mo. 685.] This is true whether such charter is made by the General Assembly of the State, by general laws, as in the case of cities of the first, second, third and fourth classes, or by a vote of the people in designated cities under constitutional provisions, as in St. Louis and Kansas City. In both cases the charters are mere legislative acts. 'A charter is the organic law of a city in this State, whether it emanates from the General Assembly, or is framed and adopted by the people of the municipality by authority of the Constitution.' [Kansas City v. Oil Co., 140 Mo. l. c. 471.] So that legislative acts (which are the charters of four classes of our cities) are the same in character as are the special charters voted by the people of cities having voted special charters under the Constitution. They are each mere legislative acts (one class by the General Assembly, and the other by direct vote of the people, as the legislators, under the authority of the Constitution), and in this sense stand on a par. It is only by reason of constitutional direction that a state law may supersede and thwart a charter provision. These directions (from the Constitution) we have set out, supra, in so far as they apply to the city of St. Louis.

"But the charter provisions, in order to avoid conflict, do not have to accord with the state law in mere matters of detail. The charter provisions must not be out of harmony (in the public policy and otherwise) with the general laws of the State, and the public policy therein announced. [Kansas City v. Oil Co., 140 Mo. l. c. 469.]"

Even subsequently passed statutes, if in spirit and in public policy they conflict with a St. Louis city charter provision, annul and kill the charter provision at once. Charters are thus, and thus only, kept in harmony with constitutional and statutory provisions. After the adoption of the Charter of 1914 there was published the Revised Code of St. Louis annotated by Hugh K. Wagner, which volume covers not only the Charter of 1914, but the applicable laws of the State pertaining to the city of St. Louis, as well as constitutional provisions so pertaining. In an extended note on the 1914 City Charter, at page 529 of the volume, the annotator has well said:

"The charter must always be in harmony with the Constitution and laws of the State. [See cases heretofore and hereinbelow cited; also State ex rel. v. Telephone Co., 189 Mo. 83, 88 S. W. 41; State ex rel. v. Police Commissioners, 184 Mo. 139, 71 S. W. 215, 1133, 88 S. W. 27; Ewing v. Hoblitzelle, 85 Mo. 76 (discussing the objects in view in adopting the St. Louis Charter); State ex inf. v. Lindell Ry., 151 Mo. 182, 52 S. W. 248 (same); State ex rel. v. Stobie, 194

Mo. 14, 92 S. W. 191 (see discussion as to St. Louis Scheme and Charter in both majority and dissenting opinions); State ex rel. v. Kimmel, 256 Mo. 611, 165 S. W. 1067.]

"Hence, and also because the power of the Legislature to supersede or modify the charter or ordinance provisions exists, *it follows that when the ordinance or charter provisions are, or. become, in conflict with prior or subsequent state statutes embodying* state *policy* or with the Constitution, such ordinances or charter provisions are or become void, and must yield to the higher law. [Levy v. Kansas City, Kan., 168 Fed. 524, 93 C. C. A. 523, 22 L. R. A. (N. S.) 862; State ex rel. v. Stobie, 194 Mo. 14, 92 S. W. 191, 200 (holding a provision in the Scheme repealed by the Police Act); St. Louis v. Meyer, 185 Mo. 583, 84 S. W. 914; State ex rel. v. Police Commissioners, supra; Badgley v. St. Louis, 149 Mo. 122, 50 S. W. 817 (declaring a charter provision void as contrary to the Code of Civil Procedure); Ford v. Kansas City, 181 Mo. 137, 79 S. W. 923; State ex rel. v. Railway, 117 Mo. 11, 22 S. W. 910; St. Louis v. Bernard, 249 Mo. 51, 155 S. W. 394; State ex inf. v. Business Men's Club, 178 Mo. App. 551, 163 S. W. 901; Ewing v. Hoblitzelle, 85 Mo. 76; State ex rel. v. Bell, 119 Mo. 75, 24 S. W. 765; State ex rel. v. Matthews, 94 Mo. 117, 7 S. W. 17.]"

A reading of these cases will be at least enlightening to one who conceives that there is something sacred about a mere city charter provision, or to one who conceives that such a charter is to the city what the Constitution is to the State. In Ewing v. Hoblitzelle, 85 Mo. 1. c. 75 et seq. it is said:

"The next and last objection to the validity of the act, which we shall notice, is that it is in violation of Sections 21, 22, 23, 24, and 25 of Article 9, of the Constitution. It is argued that inasmuch as these sections authorized the voters of the city of St. Louis to frame and adopt a charter for the government of the city, which, when adopted in the manner therein provided, should take the place of and supersede the charter theretofore granted by the Legislature and all amendments thereto, as to all matters of local self-government created an *imperium in imperio*, and as to such matters the city was emancipated from state and legislative control. These sections will satisfactorily show, if examined by themselves, and would show, were it in our province to examine them in the light of the debates when they were the subjects of discussion in the Convention which formulated the Constitution, conclusively, that the chief object sought to be accomplished by them was not to emancipate the city from legislative control, but to allow it to enlarge its limits and cut it loose, when thus enlarged from the county, so as to free it from county government and exempt the property therein from taxation for county purposes. It is true that constitutional authority was

given to the people of the city to frame and adopt a charter which should supersede the charter and all amendments to it in existence at the time of its adoption, but the idea that it was thereby intended to create a sovereignty, and deny to the State the right of control, is, we think, completely overthrown by the following limitations or conditions imposed by Section 23, Article 9; viz.: 'Such charter and amendments shall always be in harmony with and subject to the Constitution and laws of the State of Missouri.' 'Subject to,' that is, placed under the authority, the dominion, of the Constitution and laws of the State. That it was never designed to free the city from state control is further shown by Section 25 of Article 9, which is as follows: 'Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State.' ''

This Ewing case has stood the test of time. The doctrine there announced is as much the law to-day as it was the day it was an-announced. There is much in some of the writings upon this case that smacks strongly of the *"imperium in imperio"* doctrine as to matters of local self-government for St. Louis. Such views were thoroughly exploded by the Ewing case, and sad will be the day when such a view (as urged by counsel, but denied by the court in Ewing's case, supra) shall ever become law in this State. Up to this good hour our court has stood with a firm face against it, with only an occasional muttering to the effect that such a charter is to the city what the Constitution is to the State. These mutterings are without foundation. They would establish home rule for such cities by or-dinances rather than by state laws.

With the underbrush cleared, we can now take up some of the real questions in these two cases. We say two cases, because when you write in one you write for both.

IV. Prior to the Charter of 1914 the city of St. Louis had the Charter of 1876, adopted in 1876, under the authority of Section 20 of Article IX of the Constitution of 1875. No other charter could be adopted under the authority of said Section 20 of Article IX of the Constitution, because the same or similar con-ditions could not thereafter exist. In other words when there was a separation of the city of St. Louis, from the county of St. Louis (with added territory and change of boundary lines), by the adoption of the Scheme and Charter authorized by Section 20 of Article IX, said Section 20 was no longer constitutional authority for the writing and adoption of an-other charter for the city. It became a dead letter in this regard. It was so recognized, when in 1902 Section 22 of Article IX was amend-ed, the several portions of which new Section 22 of Article IX we have

quoted, supra. Section 20, supra, was never recognized as a continuing authority to adopt charters for the city. With this out of the way, we come to the question as to the alleged grant of power to amend a charter (subsequently adopted), under new Section 22 of Article IX. This calls for a comparison of old Section 22 with new Section 22, and the consideration of both with reference to Sections 20 to 25, inclusive, of the Constitution prior to the amendment of Section 22 in 1902. As said, Section 20 of Article IX of the Constitution of 1875 authorized the submission of a scheme for (1) the separation of the city of St. Louis from the county of St. Louis, (2) for enlarging the city by taking in additional territory, and (3) providing for named conditions to be met by reason of the separation, both as to the government of the county and the city. The facts are that Sections 20 to 25 of the Constitution were dealing with this single thought in view. Future charters for the city were not mentioned nor provided for, and evidently never thought of at the time the Constitution of 1875 was written. Not until 1902 was it thought advisable to authorize the city to write and adopt a new charter. Up to that time amendments to the Charter of 1876 were deemed sufficient, although such amendments could not be made oftener than once in every two years, and the vote required to be obtained was almost prohibitive.

But to a comparison of the old and new Section 22 of Article IX. Original Section 22 provided for amendments to "the charter so ratified" (in 1876, when the county and city were separated by the Scheme and Charter), and reads;

"The charter so ratified may be amended *at intervals of not less than two years,* by proposals therefor, submitted by the law-making authorities of the city to the qualified voters thereof at a general or special election, held at least sixty days after the publication of such proposal, and accepted by *at least* three-fifths of the qualified voters voting *thereat.*"

In 1902 (at the general election on November 4th of said year) this old Section 22 of Article IX of the Constitution of 1875 was repealed, and the following new section in lieu thereof was adopted:

"Section 22. The charter so ratified may be amended by proposals therefor submitted by the law-making authorities of the city to the qualified voters thereof, at a general or special election held at least sixty days after the publication of such proposals and accepted by three-fifths of the qualified voters voting for or against each of said amendments so submitted; and the law-making authorities of such city may order an election by the qualified voters of the city of a board of thirteen freeholders of such city to prepare a new charter for such city, which said charter shall be in harmony with and subject to the Constitution and laws of the State, and shall provide,

among other things for a chief executive and at least one house of legislation to be elected by general ticket. Said revised charter shall be submitted to the qualified voters of such city at an election to be held not less than twenty nor more than thirty days after the order therefor, and if a majority of such qualified voters voting at such election ratify such charter, then said charter shall become the organic law of such city, and sixty days thereafter shall take effect and supersede the charter of such city and all special laws consistent therewith.'' [See Laws 1905, p. 320, and Laws 1901, p. 263.]

Under this constitutional provision the new City Charter of 1914 was framed and adopted, and become effective August 29, 1914.

The amendments attacked in this proceeding are amendments to the Charter of 1914. The contention is that there is no constitutional authority to amend the Charter of 1914, that the reference made in *new* Section 22 of Article IX of the Constitution, as well as the old Section 22 of said article, is only to the charter adopted in 1876, when the Scheme and Charter were submitted and adopted, under the Constitution of 1875, and not to any subsequent or other charter. The scheme had to be adopted by both the county and city of St. Louis, but the charter was to be adopted by the voters in the city, as such city was enlarged by the proposed new charter. In other words, all voters within the extended limits of the new charter had the right to vote for or against said new charter. This particular question involves a construction of new Section 22 of Article IX of the Constitution, and more particularly the first part thereof. It will be noted that the first part of this new Section 22, adopted November 4, 1902 (Laws 1905, p. 320), has just two parts, and these are separated by a semicolon *only*. Save a few scattering commas, there is not another punctuation mark therein, save the period at the end thereof. The two parts deal with separate subjects. The first part deals with amendments to a charter, and the second with the making of a new and complete charter. Singularly the subject of amendments to a charter is dealt with first, and not after the provision for making a charter. This first portion is practically taken from the Constitution of 1875, Section 22. That we may have them together for this discussion we shall recopy both of them here at this point. The whole of old Section 22 of Article IX of the Constitution of 1875, reads:

''The charter so ratified may be amended *at intervals of not less than two years,* by proposals *therefor,* submitted by the law-making authorities of the city to the qualified voters thereof at a general or special election, held at least sixty days after the publication of such proposals, and accepted by *at least* three-fifths of the qualified voters voting *thereat.''*

Note closely the italicized words above. These italics are ours and put herein for the purpose of making a comparison of wording. The first portion of new Section 22, Article IX, reads:

"Section 22. The charter so ratified may be amended by proposals therefor submitted by the lawmaking authorities of the city to the qualified voters thereof, at a general or special election held at least sixty days after the publication of such proposals and accepted by three-fifths of the qualified voters voting for or against each of said amendments so submitted."

Now compare the two. If you strike from old Section 22 the italicized words, which are in three separate places, thus (1) *"at intervals of not less than two years,"* (2) "at least," and (3) at the end the word *"thereat,"* and in lieu of the word *"thereat"* substitute the words ".for or against each of said amendments so submitted," you have the first portion (all that portion down to the semicolon) of new Section 22 of Article IX. Thus we have the origin of this clause of new Section 22 of Article IX. What does it mean, when it says: *"The charter so ratified* may be amended, etc.? Keep in mind that there was then only the one charter (that of 1876), which was ratified under the provisions of the original Constitution of 1875, at the time the Scheme and Charter were ratified and adopted. We cannot write constitutions by uncalled-for construction when the language is plain. The words "so ratified" mean something that has been done, and not something to be done in the future. So also the words "The charter *so ratified"* mean an existing charter, and not one to come into existence later. The Charter of 1914 had neither been *written* nor *ratified* at the time the foregoing language was used in the amendment of 1902. This entire portion of new Section 22 of Article IX can only refer to the Charter of 1876 and not to the Charter of 1914. This amendment of 1902 dealt with two subjects, (1) amendments to the existing charter "so ratified," and (2) with the method of making and adopting a new charter. But the new Section 22 of Article IX says nothing about how to amend charters made and adopted in the future. How easy it would have been to have written it so as to cover both the existing charter, and those to be made thereafter under the authority granted in the latter portion of the said new Section 22 of Article IX. It may have been thought that provisions for amendment would be inserted in any new charter that might be adopted thereafter, and that such would suffice. This question we do not now rule. We have no fault to find with the rule announced in Morrow v. Kansas City, 186 Mo. 675, l. c. 683. Once clearly granted, by the Constitution, the right to frame and adopt charters, is a continuing one, so long as the constitutional provision stands. The same is true of the broad and unqualified right to amend.

We fully agree that the *right,* when once given, both as to new charters and amendments, *"is a continuous one,* in the absence of constitutional prohibition." But, confining our remarks to the right to amend, we say that it must be unqualifiedly given. In other words there must be no limitations on the right to amend found in the constitutional provision granting it. Here we have in plain language a limitation, i. e. the city is only granted power to amend an existing charter, and none given as to future charters. It may be conceded that the right to make and adopt a charter is, of itself, sufficient to authorize the inclusion in that charter of a provision as to how amendments might be made, but that is foreign to the exact question before us now, and we do not rule the matter. It suffices to say that the Constitution in express terms granted the right to amend an existing charter, and is absolutely silent as to future charters. This is ominous. Usually the granting of a right in one form, excludes the idea of any additional grant pertaining to the same subject. It appears to us clear that the constitutional provision does not authorize the amendments made to the Charter of 1914. How easy it would have been to have so worded the Amendment of 1902 as to cover both the existing charter and future charters. The language used by the Constitution-writers is plain, and it is not for us to change or rewrite it. At the expense of brevity we want to reiterate in a way.

The St. Louis City Charter of 1876 was one adopted under the authority of Section 20 of Article IX, of the Constitution of 1875. This Section 20 could not apply to any charter thereafter to be adopted. The powers *"that be"* so thought when they procured the adoption of the Amendment of 1902. Section 20 of Article IX, as first written in 1875, was authority (1) for a scheme to separate the city of St. Louis from St. Louis County, and to enlarge the limits of such city, and (2) to adopt a charter for the government of such enlarged city. When the separation was made, no such situation as was dealt with in the Constitution of 1875, Section 20, Article IX, could ever after occur. In other words, no other charter could be adopted by the city of St. Louis under the authority of this Section 20 of Article IX. This, for the simple reason that (after the separation of county and city), Section 20 could not apply to conditions thereafter. So while, as a rule, the grant of power to adopt a charter is a continuous one, the peculiar situation as to St. Louis County and the city of St. Louis (dealt with by Section 20 of Article IX) could never thereafter arise. It was never claimed that the city of St. Louis could have adopted a new charter (such as it did adopt in 1914) by virtue of the grant made in Section 20 of Article IX. So that the only power left in the city (after the separation of county and city) was the right to amend the Charter of 1876.

It is clear to our mind that one purpose of the constitutional amendment of 1902 (new Section 22 of Article IX) was intended to facilitate amendments to the Charter of 1876. There were two obnoxious limitations (as the people evidently thought) in old Section 22 of Article IX. First, the amendments could not be made oftener than every two years, and (2) an amendment, or amendments, had to receive three-fifths of the votes cast *at the election,* and not merely three-fifths of the votes cast upon the amendment or amendments. Under the old Section 22 it was harder to carry amendments, because of the requirement of three-fifths of the votes cast at the election. Voters frequently do not vote upon these special propositions, while voting at the election, so that there might be more than three-fifths of the votes cast upon the charter amendments, in favor of the amendments, and yet there would not be three-fifths of the votes cast *at the election* in favor of the amendments. These two hindering limitations the constitutional amendment of 1902 eliminated, but the purpose was to eliminate them to facilitate amendments to the Charter of 1876. The Constitution-makers (the people), in 1902 had no idea when the city of St. Louis would want to make a new charter, as provided for by the second clause of new Section 22 of Article IX. but. they desired to remove these two obnoxious restrictions in old Section 22 of Article IX, so that amendments could more readily be made to the Charter of 1876. To our mind this was the sole and only purpose of the first clause of new Section 22 of Article IX, adopted in 1902. After the separation of city and county, there was no constitutional authority given for the adoption of another or a new charter or a new charter for the city of St. Louis. The power to amend the Charter of 1876 was hampered by the two restrictions discussed, supra.. The new Section 22 was designated (1) to facilitate amendments to the Charter of 1876, and (2) to authorize the city to frame and adopt a freeholders' charter. if it so desired. It is ominous that the grant to amend precedes the grant to frame a charter. Had the Constitution-makers desired to make this clause as to amendments apply to the freeholders' charter thereafter to be adopted, if ever, the natural place for the provision as to charter amendments would have been after the provision authorizing a new charter. Learned counsel for the city. in the brief, saw this point and undertake to break the force of relator's contention. They would have us construe new Section 22 as if the provision for amendments did, in fact, come after the provision for a new charter, and in that way refer to the charter or charters thereafter to be adopted. If courts wrote constitutions we might do this, but so long as our duties are to construe constitutions and not to write them, we must (in construing the instrument) take it just as it is written. We should not transpose the clauses thereof so as to

give it a meaning absolutely different from that expressed therein, leaving the clauses in the position as written and adopted. We can see reasons for writing and adopting the amendment of 1902 just as it is. With the changes so as to facilitate amendments to the old charter, it might have been thought, the city could get along without a new charter for some time, and as a fact it did so get along for twelve years. Then it might have been thought that when the city did adopt a new charter provisions for its amendment could be made therein. As a fact they did provide for amendments of the Charter of 1914, but not through legislative proposal. But of this later. The point here is that the very location of the two clauses, i. e. (1) that as to the amendments, and (2) that for a new charter, precludes the idea of the provision as to amendments being applicable to any new charter. Constitution-makers do not always desire to grant too much power to cities. It may be that it was thought that too much latitude as to amendments was not a good thing—especially amendments by city legislative proposal. It may be that they thought that new charters could be adopted with greater thought and care, than is usually given to mere amendments. But, be this as it may, it is clear that this constitutional provision (as to amendments) was not intended to apply to future charters, but to the Charter of 1876. It may be that the mere shifting and transposing of the clauses would make it apply to future charters, but courts are not to transpose clauses to change meanings, and a transposition of these clauses in new Section 22 does change the meaning.

The second clause of the first sentence or paragraph of new Section 22 of Article IX is the only authority for St. Louis to make a new charter. Owing to changed conditions (the separation of county and city), Section 20 of Article IX is no longer applicable or effective, as we have said, supra. This second clause in new Section 22 does not even allow a new charter to be proposed by the city legislature. Such body may provide for a board of freeholders to prepare a charter, but there is no power given for a legislative proposal of such a charter. We note this to show how carefully the Constitution-makers were keeping away from city legislative proposals. If this provision stood alone, it is clear that a board of freeholders would have to be elected whenever a change in charter provisions was desired. Amendments to the charter could only be made in that way. However, it may have been thought that the power to make and adopt a charter authorized the writing in that charter the method for its own amendment. However, we need not speculate, so far as the view of the thirteen freeholders, or charter-writers, is concerned. They did think that they could provide, in the charter, for its own amendment, and did so provide. Article V of the Charter of 1914 covers the subject of "The Initiative," and Article VI

then follows and covers the subject of "The Referendum." Section 1 of Article V of the charter reads:

"Section 1. The people shall have power, at their option, to propose ordinances, *including ordinances proposing amendments to this Charter,* and to adopt the same at the polls, with the same effect as if adopted by the board of aldermen and approved by the mayor, such power being known as the Initiative. It shall be exercised as hereinafter provided, subject to the provisions of this Charter."

In this we see the clear right to amend the Charter of 1914, but not by legislative proposal, as the amendments of 1927 were made. These charter framers thought they could provide for amendments to the charter, and did provide for such, but not by legislative proposal, but by *initiative* proposal. In no place in this Charter of 1914 did the framers provide for amendments by legislative proposal. Had they construed the first clause of new Section 22 of Article IX, as being applicable to new charters, they would not have so written Section 1 of Article V of the charter, because it would have contravened this first clause in new Section 22 of the Constitution. The charter could not provide for initiative amendments (as it does), when an applicable constitutional provision provided otherwise. So we reiterate, these thirteen writers of this Charter of 1914 did not think that the first clause of new Section 22 of Article IX applied to the charter that they were writing. There were some good lawyers in this list of thirteen freeholders, as we now recall it. Of course this act of providing for the amendment of the charter which they were preparing by the initiative only is strongly indicative of their construction of the first clause of new Section 22 of Article IX, supra. It is only valuable here on the theory that their construction aids this court in now construing the same matter. To our mind the history of the whole transaction, as to new Section 22 of Article IX, is indicative of the fact that these old fellows (in 1902), who were interested in the matter of a constitutional grant of power to the city of St. Louis to make a new charter, did not want to trust amendments thereto to legislative proposals. They had no doubt watched city legislation. They therefore provided for more speedy methods of amending the old charter, and for the making of a new one by thirteen men of ability, and if later the new one was to be amended let it be done by thirteen freeholders, who would give the changes serious consideration. We suggest that this idea might have been in the minds of those interested in the government of the city, and in the procurement of the Amendment of 1902 to the Constitution. But whatever may have been in the background, it is clear to my mind that there was never an intention to make the first clause of new Section 22 applicable to anything save and except the Charter of 1876. It could have been so easily written in

plain language if it was intended to make it apply to both the old and the new charter. It was not so done, and intentionally so, in my judgment. Of a very similar situation in State ex inf. v. Maitland, 296 Mo. l. c. 352, we said: "It would have been much easier for the Constitution-makers to have used language to cover all charters, rather than to have made the designation which they did." And this court in banc did not hestitate to hold that the language used did not refer to the old charter, but to the one adopted under the amendment. We there ruled that the language was such that it applied only to future charters—just the reverse to what we have here. The principle, however, is the same. For a fuller discussion see 296 Mo. l. c. 352 et seq.

*The expression "the charter so ratified" cannot refer to both the Charter of 1876 (and we know it was intended to and did refer to that charter) and a future charter. This, because the two could not be ratified in the same way. "So ratified" must refer to either time or manner of ratification, or both. If it refers to either it cannot, in the situation we have here, refer to anything but the Charter of 1876. No other charter can be ratified in the manner, nor at the time, of the ratification of the Charter of 1876.*

V. (A) Before going to another proposition, we want to reiterate and emphasize what we have last said above. We say (1) that the words "the charter so ratified" refer to the time or manner of ratification, or to both, (2) that there is and can be no doubt that they (at least) referred to the Charter of 1876, and (3) that they could not and did not refer to a future charter of St. Louis, because no future charter could be ratified in the manner as was the Charter of 1876, nor at the time of the ratification of such Charter of 1876. In other words, if this language referred to the Charter of 1876, it could not, by the very force of the different conditions and situations, refer to any future charter. With this we pass to a thought we had in mind when we started this subdivision of this opinion.

(B) In the Charter of 1914 the city of St. Louis undertook to provide for legislation by both initiative and referendum. It placed the legislative department of the city (in this respect) in the same position as the State under Section 57 of Article IV of the constitution. See Articles IV, V and VI of the Charter of 1914. Article IV, in Section 1, of this charter, vests the legislative power of the city in a board of aldermen, "subject to the limitations of this charter." The limitations are found in the two succeeding articles (V and VI), the first of which provides for initiation of ordinances, by the people, and the second for the referendum of ordinances passed by the city Legislature. Section 19 of Article IV of said charter reads:

"Sec. 19. No ordinance, unless it be an emergency measure, shall take effect until thirty days after its approval by the mayor or thirty days after adoption over his veto."

Then in the original charter, Section 20 of said Article IV, an emergency measure is thus defined:

"Sec. 20. An emergency measure is any ordinance necessary for the immediate preservation of the public peace, health, or safety and declared to be an emergency measure; any ordinance calling or providing for any election or vote by or submission to the people; any ordinance making an appropriation for the payment of principal or interest of the public debt, or for current expenses of the city government; any general appropriation ordinance; or any ordinance fixing any tax rate; but no ordinance granting, enlarging or affecting any franchise or amending or repealing any ordinance adopted by the people under the initiative shall be an emergency measure."

To obviate the required time as provided in Section 19, supra, and to foreclose and prevent a referendum of street improvement ordinance, the Third Amendment of 1927 added the words in black type to said Section 20 of Article IV of the Charter of 1914. The section as amended reads:

"Section Twenty. An emergency measure is any ordinance necessary for the immediate preservation of the public peace, health or safety, **or providing for public work or improvements of any kind or repairs thereof, or establishing a benefit or taxing district or a sewer district, or a joint sewer district,** and declared to be an emergency measure; any ordinance calling or providing for any election or vote by or submission to the people; any ordinance making an appropriation for the payment of principal or interest of the public debt, or for current expenses of the city government; any general appropriation ordinance, or any ordinance fixing any tax rate; but no ordinance granting, enlarging or affecting any franchise or amending or repealing any ordinance adopted by the people under the initiative shall be an emergency."

What we have said in previous paragraphs suffices to rule this case, but we cannot refrain from suggesting that what is an emergency measure (under initiative and referendum provision) has been definitely held to be a court question, and not a legislative question. In other words, the lawmakers cannot by calling a measure an emergency measure make it such, and thus take it out of the referendum. Nor does Section 36 of Article IV of the State Constitution suffice for this purpose. We have construed our constitutional provision (Sec. 57, Art. IV) in this light. Some of the cases will be pointed out, infra. The charter of a city cannot go beyond the State Constitution, so construed, and make a matter an emergency

measure, when in fact, it is not such. All charters are subject to the Constitution, and the construction given by this court of the Constitution is binding in the construction of charters. The city charter on Initiative and Referendum cannot be opposed to the public policy of the State, as such public policy is found in the Constitution and laws. The clear purpose of amending Section 20 of Article IV of the Charter of 1914 was to cut out the thirty days required to elapse (by Section 19 of Article IV of the charter) before the ordinance could become effective after being signed by the mayor, and by this Amendment Three (which is one especially attacked in this case) to make the mere improvements of streets emergency measures, *and thus cut off referendum of such ordinances.* It is a clear effort to make an emergency measure out of a thing not in fact an emergency matter, *by a simple legislative declaration.* Making and amending city charters are only legislative functions. [Morrow v. Kansas City, 186 Mo. 675.]

The people in adopting a charter for St. Louis in 1914 (and for that matter at any time theretofore, since 1875) were exercising this purely legislative function under the constitutional grant of power. When they wrote therein provisions for the initiative and the referendum, such provisions must accord with, and not be contrary to the State constitutional provisions with reference to these subjects. In other words, the charter provision cannot contravene the State Constitution. These charter provisions must accord with the general public policy of the State.

On the question of local self-government in cities adopting their own charters, the most liberal case, of the older cases, is Kansas City v. Oil Company, 140 Mo. 458. Yet this Oil Company case (140 Mo. l. c. 472) cites with approval State ex rel. Kansas City v. Field, 99 Mo. 352 (opinion by BLACK, J.), and the Field case (99 Mo. l. c. 355) cites with approval the old case of Ewing v. Hoblitzelle, 85 Mo. l. c. 76. On page 76 of the Ewing case is the discussion of the *"imperium in imperio"* contention, as to purely local matters in those cities having special charters, which contention is soundly condemned by NORTON, J., writing for an undivided court. Even in the Oil Company case (140 Mo. l. c. 471), GANTT, J., said:

"A charter is the organic law of a city in this State, whether it emanates from the General Assembly, or is framed and adopted by the people of the municipality by authority of the Constitution. *Being a law for the government of the municipality,* it is binding upon all courts, and it violates no principle of our government to say that the courts, when called upon, must enforce *these municipal laws unless they conflict with the Constitution, and are not in harmony with the Constitution and laws,* and, as already said, mere differences in details do not render such laws inharmonious. *So long as Kansas*

*City, under its special charter, does not* invade the province of general legislation, *or attempt to change the policy of the State 'as declared in her laws for the people at large, it will not be held to be out of harmony with such laws,* notwithstanding the provisions of the special charter may be different from the general statutes prescribed for the government of other cities in their local affairs.''

Note what is said about contravening the public policy of the State, whether such public policy is expressed in constitutional provisions, or in statutory laws. A city charter provision which tramples upon, and is inconsistent with, the public policy of the State must fall. And this is from the most liberal opinion in the State, so far as city charter provisions for local self-government, are concerned.

If the State did not recognize direct legislation by the people, who is there to say that a city (the creature of the State) can contravene this general public policy of the State by charter provisions? Even the Oil Company case, supra (the most liberal of all), condemns it. On the other hand, if the State does establish a system of direct legislation (by initiative and referendum), then the city charter provisions must conform in a *substantial* manner to this announcement of the State's public policy. If a city can thus contravene general state public policies, then the municipality (the creature of the State) can legislate as it pleases, irrespective of the public policies of the State, duly expressed in Constitution and general laws. Such is not the law. If it be the law the people of Missouri have adopted many useless constitutional grants to the different classes of cities, and the lawmakers have passed many useless statutes.

By Section 57 of Article IV of the Constitution, the public policy of this State upon the Initiative and Referendum in legislation is announced. This public policy (as to direct legislation by the people), says what kind of legislation shall be exempt from the referendum. To say that a city can ignore this public policy of the State, and preclude all kinds of measures from referendum, by charter provisions, will not do. It would carry into effect the doctrine of *"imperium in imperio"* condemned in Ewing's case, supra, and from thence on down to this hour. This constitutional provision (Sec. 57, Art. IV) outlines, in a general way, what are emergency measures. No city charter can stand, which goes beyond these constitutional provisions. We mean that an emergency measure in the city charter provisions must not go beyond the *general principles* of an emergency measure as defined in the Constitution, which definition is a part of the expressed public policy of the State. This court has ruled that whether or not a measure is an emergency measure, within this expressed public policy of the State, is a question for the courts, in the final determination. The legislative

determination or declaration is not final. [State ex rel. Westhues v. Sullivan, 283 Mo. 1. c. 584, Point V, 224 S. W. 1. c. 337 et seq.; State ex rel. Pollock v. Becker, 233 S. W. 641.] In the latter case five of the seven judges agreed upon the rule that what was an emergency measure was a question for the courts. Later cases are to same effect.

Amendment No. 3 to the city charter goes far beyond the public policy of the State, as expressed in the Constitution, when it undertakes to say that the mere improvement of a street is an emergency measure and therefore not subject to referendum. Such a provision, in order to stand, must come *fairly within the general class of emergency* measures as outlined by the State. State ex rel. Asotsky v. Regan, 317 Mo. 1216, 298 S. W. 747, disposes rightfully of a measure which falls within *a fair construction of the class of emergency measures covered by Section 57 of Article IV of the Constitution*. No uneasiness need be suffered about Asotsky's case, supra. The public safety of the citizens of a city would be absolutely destroyed, if all measures for the raising of revenues to keep the city going as a policing power, for the protection of the lives of its citizens, could be held up by referendum. The city has a right *to exist* in the matter of protecting the lives and property of its citizens, and to this end to fix tax rates and raise revenue. Such measures are real emergency measures, and within *the general terms of Section 57 of Article IV* of the Constitution. But how different the mere matter of improving streets. The most that can be said is that such measures, if referred, might produce inconvenience, but they are in no sense emergency measures, as this court has construed our Constitution. In making the improvement of a street an emergency measure, the city charter, as amended April 5, 1927, by Amendment No. 3, contravenes the *general public legislative policy of the State*, and being a court question, under the construction given to Section 57 of Article IV by this court, we must so rule.

There is one further thought closely related hereto, which we take up next.

VI. *If there were nothing else in this case as to Amendment No. 3 to the city Charter of 1914 (made April 5, 1927), that a mere street improvement is declared to be an emergency measure condemns the amendment.*

The foregoing is but in accordance with the established *Missouri* rule that whether or not a given legislative measure is in fact an emergency measure is a court question and not finally determined by legislative declaration. This rule applies to city legislative measures as well as to State legislative measures. We cannot say (with any substantial reason therefor) that the rule should not apply to city legislative measures, as well as to State legislative measures. Have

these mere creatures of State laws risen to such heights, as to say to *this court*, You can say what constitutes *emergency measures in State laws, or State measures,* but when you come to municipal alleged *emergency measures* you must keep your hands off because our legislative body (the people by direct vote) can do as it pleases, and make any measure *an emergency by mere declaration?* Such is not sound sense, and therefore not sound law. This court can say whether or not mere street improvements are emergency measures in law or in fact. *No court can say that they are emergency measures in either fact or law.* This short paragraph suffices to direct the quashing of the record in this case, and in the interest of sound jurisprudence it should be done. There are other reasons, but we have trespassed upon time and patience already. We most respectfully dissent to the majority opinion. *Gantt, J.,* joins in these views.